Jeremy S. Williams (DC 994825)
Peter J. Barrett
Adolyn C. Wyatt
KUTAK ROCK LLP
1021 East Cary Street, Suite 810
Richmond, Virginia 23219
Telephone: (804) 644-1700
Facsimile: (804) 783-6192
*Counsel for the Donald H. Patterson, III Revocable Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRACKED EGGERY INC., | ) | Case No. 24-00416 (ELG) |
| | ) | |
| Debtor. | ) | Subchapter V |
| | ) | |

## MOTION TO DISMISS CASE FOR CAUSE
## AND MEMORANDUM IN SUPPORT THEREOF

The Donald H. Patterson, III Revocable Trust (the "Trust"), by and through its undersigned counsel, hereby files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit E**, pursuant to §§ 305 and 1112(b) of title 11 of the United States Code (the "Bankruptcy Code") dismissing the bankruptcy case (the "Bankruptcy Case") of the above-captioned debtor and debtor in possession (the "Debtor"). In support thereof, Trust states as follows:

## PRELIMINARY STATEMENT

1. The above-captioned case does not belong in bankruptcy as this bankruptcy serves no purpose and is a disservice to creditors, primarily non-insider creditors and is in reality, a litigation tactic to try and force the hand of the Debtor's largest creditor.

2. As should be apparent, the Debtor is a holding company which has no income and no operations. The operating entities, which are the ones facing headwinds and actually in need of restructuring, are not in bankruptcy. This Bankruptcy Case is not about implementing a restructuring plan that provides an opportunity for the company to start over. Instead, it is a litigation tactic.

1

3.    Over the past few years, the two shareholders of the Debtor, the Trust and an entity comprised of the company's founders, have been at odds with one another.  Specifically, the Trust questioned the decisions of management and recently, has sought the removal of the same.  Their mismanagement of the company, breaches of fiduciary duty and the violations of the Debtor's shareholders' agreement have left the Trust with no other option than to exercise its legal remedies.  Having suffered a defeat in state court and facing an inevitable removal from their management positions, the insiders have now filed the instant Bankruptcy Case.  The Bankruptcy Case however, does not resolve the company's issues, it merely buys management time by delaying their removal from control.  This Bankruptcy Case also does not resolve the massive debt load and operational issues the operating entities face. Management has no plan to remedy those matters. What is clear though, is putting a holding company with no operations, no income and no physical assets into bankruptcy, benefits no party other than the insiders who are trying to stave off their removal from control.

4.    The change needed here can be accomplished through state court litigation, not bankruptcy.  For years, current management of the Debtor has utilized the company's assets for their personal gain to the detriment of the underlying business operations.  Funds which have been provided by the Trust have been grossly mismanaged and redirected to the pockets of management in the form of salaries.  Potential financing which could have set the company on the path to recovery was denied in favor of protecting management's equity interests.  Basic principles of business were ignored as management sought high interest financing in the form of merchant cash advances, while simultaneously failing to pay basic tax obligations.  Instead of pursuing potential restructuring options which would have facilitated a recovery for creditors, management has sought to protect their control

4915-7564-6214.3

and equity interests by filing the instant Bankruptcy Case. These circumstances, a meaningless bankruptcy, two-party litigation and gross mismanagement, favor only one outcome – dismissal.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over the relief requested in the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

## BACKGROUND

6.      The Cracked Eggery business (the "<u>Business</u>" or "<u>Company</u>") initially started as a food truck in 2020 during the pandemic.  Messrs. Tab, Zarinsky and Brieklmeier (the "<u>Insiders</u>") were the founding parties of what is currently the operation known as Cracked Eggery. The Debtor is the holding company for a group of restaurants and a food truck, which operate in the greater Washington, DC area.  The Business is comprised of three wholly owned subsidiaries which each own and operate distinct business segments, along with a separate entity, Cracked LLC, which holds the intellectual property.   The organizational structure of the Business is as follows:



7.      To facilitate the operation and expansion of the Business beyond the food truck, the Trust initially made a loan of one million dollars to the Debtor, on or around June 22, 2021 (the "<u>Loan</u>").  That initial Loan has been restructured since its inception such that the Debtor is currently indebted to the Trust pursuant Promissory Note April 6, 2023, in the original principal amount of

$1,350,286.36 (which replaced certain prior notes, the "Note"). The balance due and owing under the Note was no less than $1,295,649.95 as of November 14, 2024. The Note is attached hereto as **Exhibit A.**

8.    The Note is secured by a properly perfected, first priority lien on all assets of the Debtor, including receivables and general intangibles, pursuant to and as more particularly described in that certain Security Agreement dated June 22, 2021 (the "Security Agreement"). A UCC Financing Statement was filed with the DC Office of Tax and Revenue, Recorder of Deeds on December 8, 2023 (the "UCC Filing"). The Security Agreement and UCC Filing are attached hereto as **Exhibit B.**

9.    At the same time the Loan was initially made, the relevant parties entered into that certain Cracked Eggery, Inc. Shareholders' Agreement dated June 22, 2021 (the "Shareholders' Agreement"). As set forth in the Shareholders' Agreement, the purpose of the Loan was to "finance the creation (including the "build-out") and initial operation of two (2) Stores" which financing was to "be documented by the loan documents attached [to the Shareholders' Agreement] as Exhibit A." *See* Shareholders' Agreement, Art. X. In short, the funds provided pursuant to the Loan were to be lent by the Debtor, to the operating entities, and loan documentation was to be executed reflecting the same. A copy of the Shareholders' Agreement is attached hereto as **Exhibit C.**

10.    The Shareholders' Agreement further established that Cracked LLC would own 70% (later reduced to 62.5%) of the Debtor and the Trust would own the other 30% (later increased to 37.5%). The members of Cracked LLC are the Insiders.

11.    Starting in October 2021, the Insiders began making questionable business decisions which not only jeopardized the Business, but also the repayment of the Loan. Specifically, in October 2021, the Insiders secured a "Toast Capital Loan" which is funded by WebBank a known merchant

credit advance company.  The Toast Capital Loan is administered by the same Toast entity which oversees the ordering and payment processing for the Business.  The Toast Capital Loan swept 13.2% of the _daily_ sales from the Debtor's business as repayment for the loan.  Despite the interest of the Trust and its business experience, the Insiders did not consult the Trust or its Trustee, Donald Patterson ("Mr. Patterson"), before entering into the Toast Capital Loan.

12.    The problems were further exacerbated in the following months when the Insiders failed to pay the Sales and Use Tax Payments which the Business was obligated to pay to the District of Columbia. This is an issue which continued to plague the Business.

13.    Over the first few months of 2022, the financial situation of the Business slightly improved, thanks in part to the Trust's continued reinvestment of its loan repayments into the Business.  However, poor management decisions, including the taking of high interest loans, payments to Insiders, the mismanagement of the opening of an additional location, high labor costs, and mismanagement of the operations resulted in a default under the Note. Again, in December 2022, no Sales and Use Tax Payments were made. Neither the Trust nor Mr. Patterson were aware that such tax payments were not being made.

14.    The Trust, however, continued to support the Business, including by investing an additional $300,000 in February/March of 2023, which resulted in the Trust acquiring its additional equity interest.  Instead of using the additional financing to address issues related to the Sales and Use Tax or put such funds towards operational needs of the Business, the Insiders paid themselves $30,000.

15.    In March 2023, Mr. Patterson was informed, for the first time, that certain tax payments owed to the District of Columbia had not been made.

16.     In June 2023, because the Insiders failed to submit proper documentation to its insurance provider, the Business became obligated to pay the insurance provider an additional $50,000 to maintain coverage.

17.     In September 2023, the Insiders took another loan from Toast in the amount of $20,000 without the knowledge of the Trust or Mr. Patterson.

18.     In October 2023, the District of Columbia levied against the Business bank accounts and garnished $30,000 for failure of the Company to comply with its tax obligations.

19.     In December 2023, the Trust funded $21,000 to the Business to help with payroll, deferred numerous loan payments and restructured the Loan.

20.     Again, for the entirety of 2023, the Insiders failed to pay Sales and Use Tax for Cracked Store #1 and Cracked Store #2.

21.     The Trust also subsequently discovered that the Insiders were using company credit cards to fund personal expenses.

22.     As of the beginning of 2024, it had become unavoidably apparent that although the Insiders had created a good product, they were not sufficiently equipped to operate the Business.  To that end, at the sole expense of Mr. Patterson (which amounted to $77,919.59), a consulting firm was engaged to evaluate the Business and provide recommendations on how the Business could be improved.  A copy of the Strategic Operations Assessment (the "Report") is attached hereto as **Exhibit D.**

23.     The Report recommended, among other things, that the Insiders take a more active role in the restaurants to "provide leadership and to drive results."  *See* Report, p. 3.  The Report also suggested that: (i) the Business implement an operating structure within the restaurants; (ii)

4915-7564-6214.3

implement a marketing and social media strategy; and (iii) define who would support the restaurants with respect to human resources, marketing, research, etc. *Id.*

24.     The Trust sought to implement the recommendations contained in the Report by engaging the advisor for three months at a cost to the Trust of $150,000.  The Trustee also offered to consolidate the Company's high interest loans through an additional investment of $200,000, in exchange for increasing the equity of the Trust to 51%.  The CEO for the Company, Mr. Brickelmaier, initially agreed, but then reneged.  The Company advised the Trust that it had another investor.  Shortly thereafter, the Trustee was advised the other investor backed out.

25.     Instead of taking advantage of the generous loan terms offered by the Trust, the Insiders again sought two high-interest loans from Toast in the amounts of $20,000 and $64,400.  The two loans had a finance charge of $17,744 and required the Company remit 22% of their credit card receipts back to Toast on a daily basis.

26.     On August 14, 2024, the Insiders again sought MCA financing, this time from Parafin, in the amount of $68,000.  This MCA violated the terms of the Company's funding from WebBank, had a capital fee of $9,877, and an apparent financing charge of $45,0833.  The funding from Parafin requires the Company to pay a staggering 30% of sales.

27.     Upon information and belief, the Insiders sought and obtained funding from various MCA's while eschewing the more traditional and generous terms offered by the Trust, solely to preserve their equity interest, to the detriment of the Company and Business.

28.     During this period, the Company was also forced to close their WaterPark location as the Insiders had failed to conduct a proper financial analysis regarding income and expenses for that location.

29.     Over the past year it has become apparent that the Insiders were not interested in implementing any of the changes required to try and restructure the Business and would prefer to see the Company go bankrupt rather than give up majority ownership.  Numerous proposals from Mr. Patterson to restructure the loan and/or to provide additional financing were rejected.  The Insiders placed their own personal interests ahead of the Company in direct violation of their fiduciary duties.

30.     The Trust was left with no option but to attempt to force the changes that were necessary to save the Company.  In response, Cracked LLC filed suit against the Trust in the Superior Court of the District of Columbia, Civil Division [Case No. 2024 CAB 004314] (the "Litigation"). Cracked, LLC, through the Litigation, attempted to force the Trust into a binding mediation. Although Cracked LLC had no standing to bring the Litigation or to force a bindig mediation, in order to try and preserve the Business, the Trust consensually agreed to mediate a global resolution.  To that end, the parties did enter into a mediation agreement with Brian Harvey, Esquire (the "Mediation").  Shortly thereafter, on October 8, 2024, the DC Superior Court entered an order dismissing the Litigation for the same legal defects which existed when the suit was initiated.

31.     Both through the Mediation and outside of the same, the Trustee continued to offer proposals to Insiders that would have provided additional financing to the Company and allowed for the restructuring necessary to put the business on the right path.  Again, however, putting personal interests over fiduciary duties and their obligations to the Company, the Insiders refused all such proposals.  Such stubbornness culminated with the Company unilaterally terminating the Mediation.

32.     Having lost the Litigation and there being no cure for the defects which precipitated such dismissal, the Insiders then hatched another litigation tactic to try and force the hand of the Trust.

33.     Specifically, the Insiders advised the Trust that it intended to file a bankruptcy on behalf of the Debtor.  Notice of the same was provided to Mr. Patterson and a shareholder's meeting

was announced for November 25, 2024, at 10:00 a.m. to discuss a prospective filing.  At the shareholder's meeting, Mr. Patterson was advised that earlier that morning, the Insiders had met as the Board of Directors and voted to approve the filing of a bankruptcy petition on behalf of the Debtor. A copy of the meeting minutes were not provided at the shareholders' meeting nor was a board resolution provided.  Mr. Patterson inquired about what purpose a bankruptcy for the holding company would serve when the operating entities were the ones carrying the high-interest debt, the tax obligations and other obligations which needed to be restructured. No explanation was provided to Mr. Patterson and the Insiders unilaterally voted to approve the filing of a bankruptcy solely for the holding company.  As such, the filing of the Bankruptcy Case was approved solely by the three Insiders, without explanation or justification.

34.    Given that Insiders had made it apparent they had no interest in actually restructuring the Company, and in light of their unilateral termination of the Mediation, the Trust was left with little option but to try and protect its investment.  As such, on November 26, 2024, the Trust made demand upon the Insiders that the members of the board (*i.e.*, the Insiders) seek the appointment of a truly independent board and create a special litigation committee to investigate the failures of the Insiders. Unsurprisingly, the Insiders failed to implement any of the changes sought by the Trust. Such change would have brought a sense of independence and neutrality to Company's needed restructuring. Instead, the Insiders continued to engage in self-preservation to the detriment of the Company.

35.    On December 5, 2024 (the "Petition Date"), the Debtor effectuated their latest litigation tactic by filing the instant case.  As the docket makes apparent, the Debtor does not have ongoing operations.  No operational motions were filed and the Debtor has relatively limited debt outside of the Loan owed to the Trust and a majority of such debt is owed to family members of the Insiders.  All facts indicate this Bankruptcy Case serves no purpose.

4915-7564-6214.3

36.     Since the Petition Date, the Trust has further been advised that the Company breached its obligations under the Shareholders' Agreement and took the Loan under false pretenses. As set forth in the Shareholders' Agreement, the funds provided by the Trust were specifically to be used to fund the formation and expansion of the Company's first two brick and mortar locations.  That funding was to be in the form of a loan from the Debtor to those entities with the Trust having a lien on the repayment of such obligations.

37.     On December 11, 2024, the Debtor, through counsel, seemingly implies it misled the Trust regarding the use of the Loan funds.  Specifically, the Debtor has asserted that rather than loan the funds to the operating entities, as it said it would, it made some other form of investment in the operating entities and no loan seemingly exists.  The Company asserts the Trust has no claim to those funds.   The Insiders either lied to Mr. Patterson and the Trust when they represented, in the Shareholders' Agreement, that a loan would be established between the Debtor and the operating entities and the Trust would have a properly perfected, first priority lien on the repayment of that loan _or_ their reply of December 11, 2024 contains material misstatements of law and/or fact.[1]  If the Debtor misused the funds provided by the Loan, the debt owed to the Trust is nondischargeable.

**RELIEF REQUESTED**

38.     By this motion, Trust seeks entry of an order dismissing the Chapter 11 Case for cause pursuant to §§ 305 and 1112(b) of the Bankruptcy Code given (a) that parties are essentially engaged in state court litigation to resolve their issues; (b) that this Bankruptcy Case was filed solely as a litigation tactic; (c) that this Bankruptcy Case serves no purpose and will not aid the Company in

---

[1]     The Trust is reserving the right to assert that the funds provided by the Debtor to the operating entities were a loan even if no loan documents exist.  The Trust is still investigating the nature of the transaction, but based on the representation of counsel, the Debtor is taking the position that such funds were not in the form of a loan.

restructuring; and (d) the Insiders have repeatedly demonstrated they will put their personal interests

ahead of the Company.

**BASIS FOR RELIEF REQUESTED**

### A.    Legal Standards for Dismissal of a Bankruptcy Case Under Chapter 11

39.     The Bankruptcy Code provides for dismissal of a chapter 11 case for cause:

> [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . .

11 U.S.C. § 1112(b)(1).

40.     "A motion filed under this section [1112(b)] invokes a two-step analysis, first to determine whether 'cause' exists either to dismiss or to convert the Chapter 11 proceeding to a Chapter 7 proceeding, and second to determine which option is in 'the best interest of creditors and the estate.'" *Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 242 (4th Cir. 1994) (quoting 11 U.S.C. § 1112(b)).

41.     Section 1112(b)(4) sets forth a non-exclusive list of items which, if proven, provide cause for dismissal or conversion, including:

> (A)    substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
> (B)    gross mismanagement of the estate;
> . . .
> (D)    unauthorized use of cash collateral substantially harmful to 1 or more creditors;
> (E)    failure to comply with an order of the court;
> . . .
> (I)    failure timely to pay taxes owed after the date of the order for relief . . . .

11 U.S.C. § 1112(b)(4).

42.     Similarly, Section 305(a)(1) of the Bankruptcy Code provides that "[t]he court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case

11

under this title, at any time if-- (1) the interests of creditors and the debtor would be better served by

such dismissal or suspension." 11 U.S.C. § 305(a). Section 305(a) allows the Court to abstain from a

bankruptcy case that is better served by dismissal:

> [A] principle of the common law requires a court with jurisdiction over a particular matter to take jurisdiction. This section recognizes that there are cases in which it would be appropriate for the Court to decline jurisdiction. . . . Thus, the Court is permitted, if the interests of creditors and the debtor would be better served by dismissal of the case or suspension of all proceedings in the case, to so order.

*In re Colonial Mem'l Gardens, Inc.*, No. 81-00927-R, 1982 WL 628958, at *1 (Bankr. E.D. Va. Feb.

2, 1982) (second alteration in original) (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 325 (1977);

S. Rep. No. 989, 95th Cong., 2nd Sess. 35 (1978)). Accordingly, Section 305(a) provides this Court

with ample discretion to dismiss or suspend a bankruptcy case based upon the facts of each case. See

*In re Fax Station, Inc.*, 118 B.R. 176, 176-77 (Bankr. D.R.I. 1990).

      43.    Some factors that courts have considered in determining if dismissal is warranted

under Section 305 include: (i) economy and efficiency of administration; (ii) whether another forum

is available to protect the interest of both parties; (iii) whether there is already a pending proceeding

in a state court; (iv) whether federal proceedings are necessary to reach a just and equitable solution;

(v) whether there is an alternative means of achieving the equitable distribution; (vi) whether the

debtor and the creditors are able to work out a less expensive out-of-court arrangement which better

serves all interests in the case; (vii) whether a non-federal insolvency has proceeded so far that it

would be costly and time consuming to start afresh with the federal bankruptcy process; and (viii) the

purpose for which jurisdiction has been sought. *See id*. at 177; *In re Audio Visual Workshop, Inc.*, 211

B.R. 154, 161 (Bankr. S.D.N.Y. 1997); *In re Trina Assocs.*, 128 B.R. 858, 867 (Bankr. E.D.N.Y.

1991); *see also In re Mazzocone*, 200 B.R. 568, 575 (E.D. Pa. 1996) (collecting cases and applying

similar factors).

**B.** *Dismissal is Appropriate Under 11 U.S.C. § 1112*

44.     This Bankruptcy Case is a litigation tactic arising from a two-party dispute for which litigation has previously been filed and can be easily reinstituted, the Debtor has satisfied numerous of the criteria for dismissal under section 1112 and the Bankruptcy Case serves no other purpose.  As such, dismissal is appropriate.

45.     Cause for dismissal has been established under 11 U.S.C. § 1112(b)(4).  As set forth in those provisions of the Bankruptcy Code, numerous forms of cause exist for dismissal.  Under section 1112(b)(4)(A) dismissal is appropriate if there is a substantial or continuing loss or diminution to the estate and the absence of a reasonable likelihood of rehabilitation.  Currently, the Debtor is accruing administrative expenses which constitute a depletion of the limited resources of the Debtor.  These resources are being depleted in the form of administrative costs for Debtor's counsel as well as the Subchapter V Trustee.  The longer the Debtor remains in bankruptcy, the more these resources will be depleted.  More compelling, however, is that this Bankruptcy Case serves no purpose and therefore there is no likelihood of rehabilitation.

46.     As set forth above, the Loan was obtained under false pretenses and as such, is not dischargeable.  Even aside from this fact, the Trust is secured by all assets of the Debtor including its interests in the operating entities and the repayment of the Loans provided by the Trust. There is no outcome where the issues with the Trust are magically resolved.  The Debtor has other relatively de minimis debt, most of which is held by friendly creditors.  Even if such debt were discharged or converted to equity, the operational issues persist.  Unless and until those issues are resolved, this Bankruptcy Case serves no purpose.  As such, section 1112(b)(4)(a) mandates dismissal.

47.     Dismissal is also appropriate under 11 U.S.C. § 1112(b)(4)(B) as the Insiders have grossly mismanaged the Debtor. As set forth in the correspondence from counsel, the Insiders

misappropriated over a million dollars from the Debtor's biggest creditor and used such funds contrary to its intended purpose. Furthermore, although the Trust has provided a lifeline to the Debtor on numerous occasions, the Insiders used a portion of those funds to pay themselves. The Insiders have taken high-interest loans as opposed to friendlier financing solely to preserve their own interests over those of the Company. The Insiders have failed to comply with the basic tenants of operating a business, including paying taxes. The Insiders have refused to appoint an independent party to assess whether this Bankruptcy Case is prudent and viable. The Insiders have refused to implement necessary changes to improve the operation of the Business. The Insiders refused to more actively manage the operations and instead, chose to continue to distance themselves, even though the Debtor needs operational oversight and lacks the resources to have the Insiders merely advise the operations of the Company while employing others to provide in-store daily management. The Insiders have made it apparent they are willing to sacrifice the wellbeing of the Company in order to maintain their income and equity position in the Company. Such actions are the core of fiduciary breaches. Unless the Insiders are promptly removed, there will be no recovery for any creditors. Accordingly, section 11 U.S.C. § 1112(b)(4)(b) is satisfied.

48. The Debtor is potentially violating section 11 U.S.C. § 1112(b)(d) through the unauthorized use of cash collateral. As noted above, the Trust has a blanket lien on all assets of the Debtor. It is unclear if the Debtor is generating any income (it likely is not, further demonstrating that this case serves no purpose) and if so, how those funds are being used. The Debtor has not filed any operational motions, has not sought to use cash collateral, and has not sought any relief from the Court. This leads to one of two conclusions; (i) the Debtor is using cash collateral without authorization; or (ii) this Bankruptcy Case serves no purpose and was filed simply as a litigation tactic. In either case, dismissal is appropriate.

4915-7564-6214.3

49.     The Debtor's lack of income also presents other issues.   The Debtor's failure to generate sustained positive cash flow means that it is incurring tax liability and administrative expenses it cannot satisfy and such occurrence is evidence of "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," 11 U.S.C. § 1112(b)(4)(A), and "gross mismanagement of the estate," 11 U.S.C. § 1112(b)(4)(B).

50.     Each of these provisions, alone, constitute cause for dismissal under section 1112(b). When considered together, the abundance of facts constituting cause cannot be overstated.

51.     Another element of section 1112 for dismissal is the best interest of the creditors.   A bankruptcy court that finds that a case must be dismissed or converted enjoys greater discretion with respect to which option is best for a particular case.   "Once a court turns to the second question of determining what is in the best interest of creditors and the estate, it must ascertain the impact on the creditors and on the estate of each of the options." *Rollex* at 243.

52.     The Trust holds 70% of the debt of the Debtor.   Once you exclude insiders and their family, the Trust holds 93% of the debt of the Debtor, with such other debt being comprised solely of credit card debt.   The Trust is the party which clearly stands to be harmed the most by a failed reorganization.   Allowing this Bankruptcy Case to remain in bankruptcy will do nothing to resolve the issues of the Business.   Instead, it is anticipated that the Debtor will seek to try and wipe out, unsuccessfully, the debt of the Trust.   The Debtor will spend tens of thousands of dollars in this failed effort.   In reality, the Company needs a bottom-up restructuring.   The operating entities need to be restructured.   Only then would creditors benefit.   The best chance for the repayment of creditors is through a comprehensive and well-planned restructuring, which the Insiders have demonstrated they are incapable of devising.   Dismissal is necessary so that the help which the Company so desperately needs (which is not this Bankruptcy Case) can be achieved in state court.

4915-7564-6214.3

### C.    *Dismissal is Appropriate Under 11 U.S.C. § 305*

53.      Under 11 U.S.C. § 305, the Court can and should dismiss a bankruptcy case when the interests of the debtor and creditors would be better served.  That is the case here.

54.      Although section 305 is more traditionally used when there is pending litigation, it is not limited in the scope of its application and the intended effect should not be muffled merely because the Debtor previously filed a flawed complaint.

55.      As set forth above, the two shareholders of the Company, Cracked LLC (comprised of the Insiders) and the Trust, have been engaged in a dispute about the operation of the Company for a substantial length of time.  The Debtor tried to force its opinion on the Trust by initiating the Litigation.  That failed.  The Trustee attempted to reach a resolution by participating in voluntary Mediation.  When it became apparent that such Mediation would likely not give the Debtor the leverage it sought to force the Trust's hand, it unilaterally terminated the Mediation.  Having therefore run out of other litigation tactics, the Debtor filed the instant Bankruptcy Case.

56.      At its core, this is a dispute over the rights of two competing shareholders.  As Judge Kindred has recently noted, where state law provides a comprehensive and detailed procedure for resolving a dispute between partners or shareholders, it is unlikely that a chapter 11 proceeding would be the more efficient venue for resolution.  *See In re Ticonderoga Farms* [Case No. 22-10794] (Bankr. E.D. Va. Aug. 22, 2022)(dismissing a bankruptcy arising from dispute from two parties as being in the best interests of the creditors and debtors) (citing *In re Williamsburg Suites, Ltd.,* 117 B.R. 216, 220 (Bankr. E.D. Va. 1990)).

57.      Here, the parties have previously engaged in litigation in state court regarding the rights and remedies of the two competing shareholders.  The Litigation was dismissed because of certain defects in the Complaint filed by the Company. The underlying issues, however, can and should still be resolved in state court and the Trust is ready to proceed with doing the same.

16

58. Furthermore, if the Debtor were truly interested in reaching a resolution that is in the best interests of the Company, it would have stayed in Mediation. The fact that it terminated the Mediation indicates that the Debtor is not interested in resolving the Company's issues and the singular purpose of the Bankruptcy Case is as a litigation tactic.

59. Dismissal benefits the creditors of this case because it allows for the parties to exert their rights in state court, to get proper management for the Company involved and to actually implement a restructuring plan that resolves the issues of the entire Company. That is what the Company truly needs.

### D. No Unusual Circumstances or Reasonable Justification Prevent Dismissal

60. Finally, section 1112(b)(2) allows the debtor to prevent dismissal or conversion only if the court identifies "unusual circumstances," a plan is reasonably likely to be confirmed, and cause for dismissal is reasonably justified and will be cured "within a reasonable period of time fixed by the court." 11 U.S.C. § 1112(b)(2). "The debtor has the burden of establishing the requirements set forth in § 1112(b)(2)." *In re Ashley Oaks Development Corp.*, 458 B.R. 280, 284 (Bankr. D.S.C. 2011). No such facts exist here and as such, preventing dismissal is a burden which the Debtor has not and cannot satisfy.

61. The Debtor cannot establish any of the requirements set forth in § 1112(b)(2), all of which are necessary to avoid dismissal or conversion where cause has been shown: unusual circumstances, a reasonable likelihood of confirmation in a reasonable time, or a reasonable justification for the grounds for dismissal that will be cured in a reasonable time.

62. First, there are no "unusual circumstances" in this case of the kind that would establish that conversion and dismissal are not in the best interests of creditors and the estate. Though the Bankruptcy Code does not define "unusual circumstances," courts generally define the term to

4915-7564-6214.3

involve "unusual facts or circumstances demonstrate[ing] that the purposes of chapter 11 would be better served by maintaining the case as a chapter 11 proceeding." *In re Orbit Petroleum, Inc.*, 395 B.R. 145, 148-49 (Bankr. D.N.M. 2008) (quoting 7 Collier on Bankruptcy ¶ 1112.04[3], (Alan N. Resnick and Henry J. Sommer, eds., 15th ed. Rev. 2008)), *aff'd*, 421 B.R. 602 (B.A.P. 10th Cir. 2009) (without opinion).  A plan that would pay all creditors in full as of the effective date is an unusual circumstance in which conversion or dismissal would not favor creditors.  *Id.* at 149.  Here, there are no such circumstances.

63.    Second, there is no reasonable likelihood that a plan will be confirmed within a reasonable time in this case, where the Debtor's only prospects for reorganization hinge on the use of property belonging to others, including Trust's Cash Collateral since the Debtor does not appear to be generating any income.

64.    Third, there can be no "reasonable justification" for staying in Chapter 11.  The problems which exist with the Company – high interest loans, unpaid taxes, gross mismanagement – cannot be resolved through a Chapter 11 proceeding solely filed by a holding company.  A more comprehensive restructuring is required.

### E.    Conversion is Not Appropriate

65.    Dismissal is in the best interests of creditors here because the avenue for recovery that is most favorable is a comprehensive restructuring which can happen outside of bankruptcy through the avenues available under state law.

66.    "[I]n evaluating the interests, the court must consider the interests of all of the creditors." *Rollex* 14 F.3d at 243.  Where one unsecured creditor would be favored above the others if the case were to be dismissed, conversion is in the best interests of all of the creditors.  *Id.*  However, dismissal is appropriate "where a trustee would impose an unaffordable burden," *Greene v. U.S. Bank, N.A. (In re Gannon Int'l, Ltd.)*, 528 B.R. 906, 911 (E.D. Mo. 2015), or where business operations of

the debtor "do not generate sufficient funds to pay current expenses, and a trustee would simply add more costs and burden to the estate," *In re Midwest Props. of Shawano, LLC*, 442 B.R. 278 (Bankr. D. Del. 2010) (cited by *Gannon Int'l*).

67.    Conversion to Chapter 7 serves no benefit as the Debtor is not generating any income and any income generated is subject to the lien of the Trust.   There is no situation in which encumbered funds are recovered and distributed to any other party in light of the amount that is owed in connection with the Note.

**WHEREFORE**, the Trust respectfully requests that the Court enter an order, dismissing the Chapter 11 Case and granting such other relief as appropriate.

Dated:  December 19, 2024

**DONALD H. PATTERSON, III
REVOCABLE TRUST**

/s/ *Jeremy S. Williams*
Jeremy S. Williams (DC 994825)
Peter J. Barrett
Adolyn C. Wyatt
KUTAK ROCK LLP
1021 East Cary Street, Suite 810
Richmond, Virginia  23219
Telephone: (804) 644-1700
Facsimile: (804) 783-6192
*Counsel for the Donald H. Patterson, III
Revocable Trust*

19

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on December 19, 2024, a true and exact copy of the foregoing was served via CM/ECF or first-class mail with postage fully prepaid, to the following necessary parties:

*<u>Debtor:</u>*
Cracked Eggery Inc
c/o George Brickelmaier
5709 3rd St S
Arlington, VA 22204

*<u>Counsel for Debtor:</u>*
Kevin Robert Feig
McNamee Hosea
6404 Ivy Lane, Suite 820
Greenbelt, MD 20770
Email: kfeig@mhlawyers.com

*<u>Subchapter 5 Trustee:</u>*
Lawrence A. Katz
Hirschler Fleischer
1676 International Drive, Suite 1350
Tysons, VA 22102
Email:  lkatz@hirschlerlaw.com

*<u>United States Trustee</u>*
Michael T. Freeman
Office of the United States Trustee
1725 Duke Street, Suite 650
Alexandria, VA 22314


*/s/ Jeremy S. Williams*

4915-7564-6214.3

**<u>Exhibit A</u>**

**PROMISSORY NOTE**

| | |
|---|---|
| $1,350,286.36 | Washington, D.C. |
| | April 6, 2023 |

FOR VALUE RECEIVED, Cracked Eggery Inc., a District of Columbia corporation whose address is 1921 8th Street NW, Suite 105, Washington, DC 20001 (the *"Borrower"*) hereby unconditionally promises to pay to the order of Donald H. Patterson, III Revocable Trust UAD 8/9/2017, as amended, whose address is 830 Chester Avenue, Annapolis, MD 21403 (the *"Noteholder"*) the principal amount of One Million Three Hundred Fifty Thousand Two Hundred Eighty Six and 36/100 Dollars ($1,350,286.36) (the *"Loan"*), together with all accrued interest thereon, as provided in this Promissory Note (this *"Note"*).

This Note is expressly made in furtherance of the Cancellation of Promissory Note executed by the Noteholder dated April 6, 2023, which provides for the execution of this Note in exchange for (i) the cancellation and termination of the Amended and Restated Promissory Note between Borrower and Noteholder dated January 4, 2022; (ii) the provision of $510,000.00 in loans previously made by Noteholder to Borrower; and (iii) Noteholder's receipt of an additional seven and one-half percent (7.5%) equity interest in Borrower, for a new aggregate thirty seven and one-half percent (37.5%) equity interest in Borrower.

1.    Payment Dates.

(a)    Principal and interest shall be payable, as follows:

From the date of this Note until May 10, 2030 (the *"Maturity Date"*), interest shall be due on the outstanding principal amount of this Note at a floating rate equal to the Wall Street Journal Prime Rate (hereinafter defined) plus two percent (2.0%) (the *"Initial Note Rate"*). The Note Rate shall be a floating rate and shall initially be set as of the date of this promissory note and shall be adjusted monthly based on changes to the Wall Street Journal Prime Rate as of the last calendar day of each month. All changes in the Note Rate shall be effective as of the date of change in the Wall Street Journal Prime Rate. Payments of interest and principal shall be payable on the tenth (10th) day of each consecutive calendar month prior to the Maturity Date, provided that payments for the first two (2) months shall be deferred, and the first monthly payment shall commence and be payable on June 10, 2023. All remaining unpaid principal and interest due thereon and all other amounts owing under this Note and the Loan Documents (hereinafter defined), shall be due and payable in full in no event later than the Maturity Date. *"Wall Street Journal Prime Rate"* shall mean the prime rate as reported in the money rate column of the *Wall Street Journal* on the date of determination. Interest shall be computed on the basis of a 365/366 day year, as the case may be, for the actual number of days in the applicable period.

(b)    Prepayment; Loan Disbursement. The Borrower may prepay the Loan in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of

prepayment. Should the borrower at any time before the Maturity Date obtain a business or commercial loan from a third party lender, including any loan backed by the United States Small Business Administration that is eligible, in whole or in part, for use towards "working capital" purposes, (e.g., a "7(a)" loan but not a "504" loan) (such loan a ***Commercial Loan***),  (i) in an amount of at least Five Hundred Thousand Dollars ($500,000.00) then Borrower shall remit an amount equaling at least One Hundred Fifty Thousand Dollars ($150,000.00), plus six percent (6%) interest computed in the same manner as Section 1(a) hereof, to Noteholder in payment towards principal and accrued interest on the Loan; or (ii) in an amount of at least Two Hundred Fifty Thousand Dollars ($250,000.00) but less than Five Hundred Thousand Dollars ($500,000.00) then Borrower shall remit an amount equaling at least Seventy-Five Thousand Dollars ($75,000.00), plus six percent (6%) interest computed in the same manner as Section 1(a) hereof, to Noteholder in payment towards principal and accrued interest on the Loan, provided that such 6% interest computations and additions shall be utilized solely for the purpose of calculating outstanding proportions of the Loan payable on receipt of a Commercial Loan, and shall not serve to alter Initial Note Rate or accrual of interest on any part of the Loan in any manner; Borrower shall remit the same within ten (10) business days of final disbursement of the Commercial Loan.  At any time before the repayment to Noteholder of any amounts in the previous sentence, should the Borrower obtain a Commerical Loan in an amount less than Two Hundred Fifty Thousand Dollars ($250,000.00), then Borrower shall be required to receive the prior written consent of Noteholder prior to any distributions made to Borrower's equityholders.

(a)    _Sample Payment Schedule_. Without in any manner altering or affecting the Initial Note Rate, the calculation of monthly payments, or the payment schedule as the same are described in Section 1(a) hereof, Sample Payment Schedule is attached as Exhibit B hereto Noteholder agree that each payment due under this note shall be calculated according to the terms of Section 1(a) above, without regard to any amounts listed or specified in the Sample Payment Schedule.

2.    _Interest_.

(a)    _Default Interest_. If any amount payable hereunder is not paid when due (without regard to any applicable grace period) and has also not been excused or deferred by Noteholder in writing, whether at stated maturity, by acceleration, or otherwise, such overdue amount shall bear interest at the Note Rate plus two percent (2%) (the ***"Default Rate"***) until repaid, and any interest on the remainder of the Loan which is not overdue shall remain unaffected.

(b)    _Computation of Interest_. All computations of interest hereunder shall be made on the basis of a year of 365/366 days, as the case may be, and the actual number of days elapsed. Interest shall begin to accrue on the Loan on the date of this Note.

(c)    _Interest Rate Limitation_. If at any time the interest rate payable on the Loan shall exceed the maximum rate of interest permitted under applicable law, such interest rate shall be reduced automatically to the maximum rate permitted.

3.    _Payment Mechanics_.

(a)    <u>Manner of Payment</u>. All payments of principal and interest shall be made in US dollars no later than 5:00 PM on the date on which such payment is due. Such payments shall be made by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Borrower from time to time.

(b)    <u>Application of Payments</u>. All payments shall be applied, *first*, to fees or charges outstanding under this Note, *second*, to accrued interest, and, *third*, to principal outstanding under this Note.

(c)    <u>Business Day</u>. Whenever any payment hereunder is due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day, and interest shall be calculated to include such extension. ***"Business Day"*** means a day other than Saturday, Sunday, or other day on which commercial banks in Washington, DC are authorized or required by law to close.

(d)    <u>Evidence of Debt</u>. The Borrower authorizes the Noteholder to record on the grid attached as Exhibit A the Loan made to the Borrower and the date and amount of each payment or prepayment of the Loan. The entries made by the Noteholder shall be *prima facie* evidence of the existence and amount of the obligations of the Borrower recorded therein in the absence of manifest error. No failure to make any such record, nor any errors in making any such records, shall affect the validity of the Borrower's obligation to repay the unpaid principal of the Loan with interest in accordance with the terms of this Note.

4.    <u>Representations and Warranties</u>. The Borrower represents and warrants to the Noteholder as follows:

(a)    <u>Existence</u>. The Borrower is a corporation formed, validly existing, and in good standing under the laws of the jurisdiction of its organization. The Borrower has the requisite power and authority to own, lease, and operate its property, and to carry on its business.

(b)    <u>Compliance with Law</u>. The Borrower is in compliance with all laws, statutes, ordinances, rules, and regulations applicable to or binding on the Borrower, its property, and business.

(c)    <u>Power and Authority</u>. The Borrower has the requisite power and authority to execute, deliver, and perform its obligations under this Note.

(d)    <u>Authorization; Execution and Delivery</u>. The execution and delivery of this Note by the Borrower and the performance of its obligations hereunder have been duly authorized by all necessary limited liability company action in accordance with applicable law. The Borrower has duly executed and delivered this Note.

5.    <u>Events of Default</u>. The occurrence and continuance of any of the following shall constitute an ***"Event of Default"*** hereunder:

(a)    <u>Failure to Pay</u>. The Borrower fails to pay (i) any principal amount of the Loan when due; (ii) any interest on the Loan within five (5) days after the date such amount is

due; or (iii) any other amount due hereunder within ten (10) days after such amount is due, provided that the Noteholder may excuse or defer any monthly payment in writing, from time to time and at any time, and if the Noteholder so excuses or defers any such monthly payment, the applicable failure to pay shall be deemed to not be and to not have been an Event of Default, regardless of the date of any such excuse or deferral.

(b)     Breach of Representations and Warranties. Any representation or warranty made by the Borrower to the Noteholder herein contains an untrue or misleading statement of a material fact as of the date made.

(c)     Bankruptcy; Insolvency.

(i)     The Borrower institutes a voluntary case seeking relief under any law relating to bankruptcy, insolvency, reorganization, or other relief for debtors.

(ii)     An involuntary case is commenced seeking the liquidation or reorganization of the Borrower under any law relating to bankruptcy or insolvency, and such case is not dismissed or vacated within sixty (60) days of its filing.

(iii)     The Borrower makes a general assignment for the benefit of its creditors.

(iv)     The Borrower is unable, or admits in writing its inability, to pay its debts as they become due.

(v)     A case is commenced against the Borrower or its assets seeking attachment, execution, or similar process against all or a substantial part of its assets, and such case is not dismissed or vacated within sixty (60) days of its filing.

(d)     Failure to Give Notice. The Borrower fails to give the notice of Event of Default specified in Section 6.

(e)     Cross-Default. In addition to the other events set forth in Section 5 of this Note, it shall constitute an "*Event of Default*" under this Note should any event occur under the Second Note that would constitute an event of default thereunder or otherwise authorize the acceleration of any debt owed by Borrower to Noteholder.

6.     Notice of Event of Default. As soon as possible after it becomes aware that an Event of Default has occurred, and in any event within two (2) Business Days, the Borrower shall notify the Noteholder in writing of the nature and extent of such Event of Default and the action, if any, it has taken or proposes to take with respect to such Event of Default.

7.     Remedies. Upon the occurrence and during the continuance of an Event of Default, the Noteholder may, at its option, by written notice to the Borrower declare the outstanding principal amount of the Loan, accrued and unpaid interest thereon, and all other amounts payable hereunder immediately due and payable; *provided, however*, if an Event of Default described in Sections 5(c)(i), 5(c)(iii), or 5(c)(iv) shall occur, the outstanding principal amount, accrued and unpaid interest, and all other amounts payable hereunder shall become

immediately due and payable without notice, declaration, or other act on the part of the Noteholder.

8.  Expenses. The Borrower shall reimburse the Noteholder on demand for all reasonable out-of-pocket costs, expenses, and fees, including the reasonable fees and expenses of counsel, incurred by the Noteholder in connection with the negotiation, documentation, and execution of this Note and the enforcement of the Noteholder's rights hereunder.

9.  Notices. All notices, consents, claims, demands, waivers, and other communications hereunder ("**Notices**") shall be in writing and shall be deemed to have been effectively given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by FedEx or another nationally recognized overnight courier (receipt requested); (c) on the date sent by email (with confirmation of receipt from the intended recipient by return email or other written acknowledgment) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third (3rd) day after the date mailed, by certified or registered mail (in each case, return receipt requested, postage pre-paid). Notices must be addressed to the parties at the addresses set forth on the first page of this Agreement (or to such other address that may be designated by a party from time to time in accordance herewith).

10.  Governing Law. This Note and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based on, arising out of, or relating to this Note and the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the District of Columbia.

11.  Disputes.

(a)  Submission to Jurisdiction.

(i)  The Borrower irrevocably and unconditionally (A) agrees that any action, suit, or proceeding arising from or relating to this Note may be brought in the courts of the District of Columbia, and in the United States District Court for the District of Columbia, and (B) submits to the jurisdiction of such courts in any such action, suit, or proceeding. Final judgment against the Borrower in any such action, suit, or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(ii)  Nothing in this Section 11(a) shall affect the right of the Noteholder to bring any action, suit, or proceeding relating to this Note against the Borrower or its properties in the courts of any other jurisdiction.

(iii)  Nothing in this Section 11(a) shall affect the right of the Noteholder to serve process upon the Borrower in any manner authorized by the laws of any such jurisdiction.

(b)  Venue. The Borrower irrevocably and unconditionally waives, to the fullest extent permitted by law, (i) any objection that it may now or hereafter have to the laying

of venue in any action, suit, or proceeding relating to this Note in any court referred to in Section 11(a), and (ii) the defense of inconvenient forum to the maintenance of such action, suit, or proceeding in any such court.

      (c)   Waiver of Jury Trial. THE BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

12.    Successors and Assigns. This Note may be assigned or transferred by the Noteholder to any individual, corporation, company, limited liability company, trust, joint venture, association, partnership, unincorporated organization, governmental authority, or other entity.

13.    Integration. This Note constitutes the entire contract between the Borrower and the Noteholder with respect to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, with respect thereto.

14.    Amendments and Waivers. No term of this Note may be waived, modified, or amended, except by an instrument in writing signed by the Borrower and the Noteholder. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

15.    No Waiver; Cumulative Remedies. No failure by the Noteholder to exercise and no delay in exercising any right, remedy, or power hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The rights, remedies, and powers herein provided are cumulative and not exclusive of any other rights, remedies, or powers provided by law.

16.    Severability. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or render such term or provision invalid or unenforceable in any other jurisdiction.

*Signature page follows*

21227601v4

IN WITNESS WHEREOF, the Borrower has executed this Note as of April 8, 2023.

Cracked Eggery Inc.

By _____

Name: George Ross Brickelmeier
Title: Co-Founder

ACKNOWLEDGED AND ACCEPTED BY

NOTEHOLDER

Donald H. Patterson, III Revocable Trust UAD
8/9/2017, as amended

By_____

Name: Donald H. Patterson, III
Title: Trustee

21227601v4

ACKNOWLEDGED AND ACCEPTED BY

NOTEHOLDER

Donald H. Patterson, III Revocable Trust UAD
8/9/2017, as amended

By _Donald H. Patterson III_

Name: Lewis W. Webb, III
Title: Trustee

## EXHIBIT A

### PAYMENTS ON THE LOAN

| Date | Principal Amount Paid | Unpaid Principal Balance | Name of Person Making Notation |
|------|----------------------|--------------------------|-------------------------------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**EXHIBIT A**

**PAYMENTS ON THE LOAN**

| Date | Principal Amount Paid | Unpaid Principal Balance | Name of Person Making Notation |
|------|----------------------|--------------------------|-------------------------------|
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |

8 of 11

## EXHIBIT B

## SAMPLE PAYMENT SCHEDULE

**Promissory Note: Cracked Eggery Inc.**

**Current Note Rate: Ten Percent (10%)**

| Date | Payment | Beginning Balance | Interest | Principal | Ending Balance |
|------|---------|-------------------|----------|-----------|----------------|
| 6/10/2023 | 1 | $1,350,286.36 | $11,252.39 | $11,163.96 | $1,339,122.39 |
| 7/10/2023 | 2 | $1,339,122.39 | $11,159.35 | $11,257.00 | $1,327,865.39 |
| 8/10/2023 | 3 | $1,327,865.39 | $11,065.54 | $11,350.81 | $1,316,514.59 |
| 9/10/2023 | 4 | $1,316,514.59 | $10,970.95 | $11,445.40 | $1,305,069.19 |
| 10/10/2023 | 5 | $1,305,069.19 | $10,875.58 | $11,540.77 | $1,293,528.41 |
| 11/10/2023 | 6 | $1,293,528.41 | $10,779.40 | $11,636.95 | $1,281,891.47 |
| 12/10/2023 | 7 | $1,281,891.47 | $10,682.43 | $11,733.92 | $1,270,157.54 |
| 1/10/2024 | 8 | $1,270,157.54 | $10,584.65 | $11,831.70 | $1,258,325.84 |
| 2/10/2024 | 9 | $1,258,325.84 | $10,486.05 | $11,930.30 | $1,246,395.53 |
| 3/10/2024 | 10 | $1,246,395.53 | $10,386.63 | $12,029.72 | $1,234,365.81 |
| 4/10/2024 | 11 | $1,234,365.81 | $10,286.38 | $12,129.97 | $1,222,235.84 |
| 5/10/2024 | 12 | $1,222,235.84 | $10,185.30 | $12,231.05 | $1,210,004.78 |
| 6/10/2024 | 13 | $1,210,004.78 | $10,083.37 | $12,332.98 | $1,197,671.81 |
| 7/10/2024 | 14 | $1,197,671.81 | $9,980.60 | $12,435.7 | $1,185,236.0 |

| Date | No. | | | | |
|---|---|---|---|---|---|
| | | | | 5 | 5 |
| 8/10/2024 | 15 | $1,185,236.05 | $9,876.97 | $12,539.38 | $1,172,696.67 |
| 9/10/2024 | 16 | $1,172,696.67 | $9,772.47 | $12,643.88 | $1,160,052.79 |
| 10/10/2024 | 17 | $1,160,052.79 | $9,667.11 | $12,749.24 | $1,147,303.54 |
| 11/10/2024 | 18 | $1,147,303.54 | $9,560.86 | $12,855.49 | $1,134,448.05 |
| 12/10/2024 | 19 | $1,134,448.05 | $9,453.73 | $12,962.62 | $1,121,485.43 |
| 1/10/2025 | 20 | $1,121,485.43 | $9,345.71 | $13,070.64 | $1,108,414.79 |
| 2/10/2025 | 21 | $1,108,414.79 | $9,236.79 | $13,179.56 | $1,095,235.23 |
| 3/10/2025 | 22 | $1,095,235.23 | $9,126.96 | $13,289.39 | $1,081,945.84 |
| 4/10/2025 | 23 | $1,081,945.84 | $9,016.22 | $13,400.13 | $1,068,545.70 |
| 5/10/2025 | 24 | $1,068,545.70 | $8,904.55 | $13,511.80 | $1,055,033.90 |
| 6/10/2025 | 25 | $1,055,033.90 | $8,791.95 | $13,624.40 | $1,041,409.49 |
| 7/10/2025 | 26 | $1,041,409.49 | $8,678.41 | $13,737.94 | $1,027,671.55 |
| 8/10/2025 | 27 | $1,027,671.55 | $8,563.93 | $13,852.42 | $1,013,819.13 |
| 9/10/2025 | 28 | $1,013,819.13 | $8,448.49 | $13,967.86 | $999,851.27 |
| 10/10/2025 | 29 | $999,851.27 | $8,332.09 | $14,084.26 | $985,767.01 |
| 11/10/2025 | 30 | $985,767.01 | $8,214.73 | $14,201.62 | $971,565.38 |
| 12/10/2025 | 31 | $971,565.38 | $8,096.38 | $14,319.97 | $957,245.41 |

10 of 11

| Date | # | Balance | Payment | Interest | New Balance |
|---|---|---|---|---|---|
| 1/10/2026 | 32 | $957,245.41 | $7,977.05 | $14,439.30 | $942,806.10 |
| 2/10/2026 | 33 | $942,806.10 | $7,856.72 | $14,559.63 | $928,246.47 |
| 3/10/2026 | 34 | $928,246.47 | $7,735.39 | $14,680.96 | $913,565.50 |
| 4/10/2026 | 35 | $913,565.50 | $7,613.05 | $14,803.30 | $898,762.20 |
| 5/10/2026 | 36 | $898,762.20 | $7,489.68 | $14,926.67 | $883,835.53 |
| 6/10/2026 | 37 | $883,835.53 | $7,365.30 | $15,051.05 | $868,784.47 |
| 7/10/2026 | 38 | $868,784.47 | $7,239.87 | $15,176.48 | $853,607.99 |
| 8/10/2026 | 39 | $853,607.99 | $7,113.40 | $15,302.95 | $838,305.04 |
| 9/10/2026 | 40 | $838,305.04 | $6,985.88 | $15,430.47 | $822,874.56 |
| 10/10/2026 | 41 | $822,874.56 | $6,857.29 | $15,559.06 | $807,315.50 |
| 11/10/2026 | 42 | $807,315.50 | $6,727.63 | $15,688.72 | $791,626.77 |
| 12/10/2026 | 43 | $791,626.77 | $6,596.89 | $15,819.46 | $775,807.31 |
| 1/10/2027 | 44 | $775,807.31 | $6,465.06 | $15,951.29 | $759,856.02 |
| 2/10/2027 | 45 | $759,856.02 | $6,332.13 | $16,084.22 | $743,771.80 |
| 3/10/2027 | 46 | $743,771.80 | $6,198.10 | $16,218.25 | $727,553.55 |
| 4/10/2027 | 47 | $727,553.55 | $6,062.95 | $16,353.40 | $711,200.14 |
| 5/10/2027 | 48 | $711,200.14 | $5,926.67 | $16,489.68 | $694,710.46 |

21227601v4

| Date | No. | Balance | Payment | Interest | Ending |
|---|---|---|---|---|---|
| 6/10/2027 | 49 | $694,710.46 | $5,789.25 | $16,627.10 | $678,083.36 |
| 7/10/2027 | 50 | $678,083.36 | $5,650.69 | $16,765.66 | $661,317.70 |
| 8/10/2027 | 51 | $661,317.70 | $5,510.98 | $16,905.37 | $644,412.33 |
| 9/10/2027 | 52 | $644,412.33 | $5,370.10 | $17,046.25 | $627,366.08 |
| 10/10/2027 | 53 | $627,366.08 | $5,228.05 | $17,188.30 | $610,177.78 |
| 11/10/2027 | 54 | $610,177.78 | $5,084.81 | $17,331.54 | $592,846.24 |
| 12/10/2027 | 55 | $592,846.24 | $4,940.39 | $17,475.96 | $575,370.27 |
| 1/10/2028 | 56 | $575,370.27 | $4,794.75 | $17,621.60 | $557,748.67 |
| 2/10/2028 | 57 | $557,748.67 | $4,647.91 | $17,768.44 | $539,980.23 |
| 3/10/2028 | 58 | $539,980.23 | $4,499.84 | $17,916.51 | $522,063.71 |
| 4/10/2028 | 59 | $522,063.71 | $4,350.53 | $18,065.82 | $503,997.89 |
| 5/10/2028 | 60 | $503,997.89 | $4,199.98 | $18,216.37 | $485,781.52 |
| 6/10/2028 | 61 | $485,781.52 | $4,048.18 | $18,368.17 | $467,413.34 |
| 7/10/2028 | 62 | $467,413.34 | $3,895.11 | $18,521.24 | $448,892.10 |
| 8/10/2028 | 63 | $448,892.10 | $3,740.77 | $18,675.58 | $430,216.52 |
| 9/10/2028 | 64 | $430,216.52 | $3,585.14 | $18,831.21 | $411,385.30 |
| 10/10/2028 | 65 | $411,385.30 | $3,428.21 | $18,988.14 | $392,397.16 |
| 11/10/2028 | 66 | $392,397.16 | $3,269.98 | $19,146.3 | $373,250.79 |

21227601v4

| Date | # | Beginning Balance | Interest | Principal | Ending Balance |
|---|---|---|---|---|---|
| 12/10/2028 | 67 | $373,250.79 | $3,110.42 | $19,305.93 | $353,944.86 |
| 1/10/2029 | 68 | $353,944.86 | $2,949.54 | $19,466.81 | $334,478.05 |
| 2/10/2029 | 69 | $334,478.05 | $2,787.32 | $19,629.03 | $314,849.01 |
| 3/10/2029 | 70 | $314,849.01 | $2,623.74 | $19,792.61 | $295,056.40 |
| 4/10/2029 | 71 | $295,056.40 | $2,458.80 | $19,957.55 | $275,098.85 |
| 5/10/2029 | 72 | $275,098.85 | $2,292.49 | $20,123.86 | $254,974.99 |
| 6/10/2029 | 73 | $254,974.99 | $2,124.79 | $20,291.56 | $234,683.43 |
| 7/10/2029 | 74 | $234,683.43 | $1,955.70 | $20,460.65 | $214,222.77 |
| 8/10/2029 | 75 | $214,222.77 | $1,785.19 | $20,631.16 | $193,591.61 |
| 9/10/2029 | 76 | $193,591.61 | $1,613.26 | $20,803.09 | $172,788.52 |
| 10/10/2029 | 77 | $172,788.52 | $1,439.90 | $20,976.45 | $151,812.07 |
| 11/10/2029 | 78 | $151,812.07 | $1,265.10 | $21,151.25 | $130,660.82 |
| 12/10/2029 | 79 | $130,660.82 | $1,088.84 | $21,327.51 | $109,333.31 |
| 1/10/2030 | 80 | $109,333.31 | $911.11 | $21,505.24 | $87,828.07 |
| 2/10/2030 | 81 | $87,828.07 | $731.90 | $21,684.45 | $66,143.61 |
| 3/10/2030 | 82 | $66,143.61 | $551.20 | $21,865.15 | $44,278.46 |
| 4/10/2030 | 83 | $44,278.46 | $368.99 | $22,047.36 | $22,231.09 |

13 of 11

| 5/10/2030 | 84 | $22,231.09 | $185.26 | $22,231.09 | $0.00 |

21227601v4

**<u>Exhibit B</u>**

## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of June 22, 2021 (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this *"Agreement"*), is made by and among Cracked Eggery, Inc., a District of Columbia corporation whose address is 1921 8th St NW, Suite 110, Washington, DC 20001 (the *"Grantor"*), in favor of Donald H. Patterson, III Revocable Trust whose address is 830 Chester Avenue, Annapolis, Md. 21403 (the *"Secured Party"*).

WHEREAS, on the date hereof, the Grantor has executed and delivery a promissory note (as amended, supplemented or otherwise modified from time to time, the *"Note"*), to the Secured Party, pursuant to which the Secured Party, subject to the terms and conditions contained therein, has made a loan to the Grantor; and

WHEREAS, under the terms of this Agreement, the Grantor desires to grant to the Secured Party a security interest in the Collateral, as defined herein, to secure any and all Secured Obligations, as defined herein.

NOW THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  <u>Definitions</u>. All capitalized terms used herein without definitions shall have the respective meanings set forth in the Note. Unless otherwise defined herein, terms used herein that are defined in the Uniform Commercial Code as in effect from time to time in the Commonwealth of Virginia (the *"UCC"*) shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

2.  <u>Grant of Security Interest</u>.

(a)    For value received, the Grantor hereby grants to the Secured Party, to secure the payment and performance in full of all of the Secured Obligations (as defined in Section 3 of this Agreement), a security interest in and pledges and assigns to the Secured Party the following properties, assets, and rights of the Grantor, wherever located, whether the Grantor now has or hereafter acquires an ownership or other interest or power to transfer, and all proceeds and products thereof, and all books and records relating thereto (all of the same being hereinafter called the *"Collateral"*): all personal and fixture property of every kind and nature including all goods (including inventory, equipment, and any accessions thereto), instruments (including promissory notes), documents (whether tangible or electronic), accounts (including health-care insurance receivables), chattel paper (whether tangible or electronic), money, deposit accounts, letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, supporting obligations, and other contracts rights or rights to the payment of money, insurance claims and proceeds, tort claims, and all general intangibles (including all payment intangibles).

(b)    If the Grantor shall at any time hold or acquire a commercial tort claim, the Grantor shall immediately notify the Secured Party in writing of the details thereof and grant to the Secured Party in such writing, in form and substance

Doc ID: a00741e0adf2d62215da132fc4e1194aff295b7e

satisfactory to the Secured Party, a security interest therein and in the proceeds thereof.

3.      Secured Obligations. This Agreement secures the prompt and full performance and payment of all of the indebtedness, obligations, liabilities, and undertakings of the Grantor to the Secured Party, of any kind or description, individually or collectively, whether direct or indirect, joint or several, absolute or contingent, due or to become due, voluntary or involuntary, now existing or hereafter arising (including, all interest, fees (including attorneys' fees), costs, and expenses that the Grantor is hereby or otherwise required to pay and perform pursuant to the Note, this Agreement, or any other Loan Document, by law or otherwise accruing before and after the filing of any petition in bankruptcy or the commencement of any insolvency, reorganization or like proceeding relating to the Grantor, whether or not a claim for post-petition interest, fees or expenses is allowed in such proceeding), irrespective of whether for the payment of money, under or in respect of the Note, this Agreement, or any other Loan Document, including instruments or agreements executed and delivered pursuant thereto or in connection therewith (the *"Secured Obligations"*).

4.      Changes in Location of Collateral. The Grantor hereby agrees to notify the Secured Party, in writing or via electronic communication, within five (5) days upon any change in the location of any Collateral (except for changes of location or movement in the ordinary course of business) and provide the Secured Party with the new location of such Collateral.

5.      Changes in Grantor. The Grantor hereby agrees to notify the Secured Party, in writing or via electronic communication, at least five (5) days before any of the following actions: (a) change in the location of the Grantor's place of business; (b) change in the Grantor's name; (c) change in the Grantor's type of organization; (d) change in the Grantor's jurisdiction of organization; and (e) change in the Grantor's corporate structure.

6.      Transfer of Collateral. The Grantor shall not sell, offer to sell, assign, lease, license, or otherwise transfer, or grant, create, permit, or suffer to exist any option, security interest, lien, or other encumbrance in, any part of the Collateral (except for sales or leases of inventory or licenses of general intangibles in the ordinary course of business), without prior written approval from the Secured Party.

7.      Grantor Representations and Warranties. The Grantor hereby represents, warrants, and covenants that: (a) the Grantor owns or has good and marketable title to the Collateral and no other person or organization can make any claim of ownership of any kind on the Collateral; (b) the Grantor has the full power, authority and legal right to grant the security interest in the Collateral; (c) the Collateral is free from any and all claims, encumbrances, rights of setoff or any other security interest or lien of any kind except for the security interest in favor of the Secured Party created by this Agreement and (d) this Agreement creates in favor of the Secured Party a valid security interest in the Collateral, securing payment of the Secured Obligations, and such security interest is first priority. The Grantor will defend the Collateral against all claims and demands made by all persons claiming either the Collateral or any interest in it.

8.      Grantor Covenants and Insurance. The Grantor hereby grants to the Secured Party the right to enter the Grantor's property to inspect the Collateral at any reasonable time, provided that the Secured Party gives the Grantor notice within two (2) business days of any

2

Doc ID: a00741e0adf2d62215da132fc4e1194aff295b7e

inspection, however in no case shall notice be required if the Secured Party enters the Grantor's property for the purposes of remedying a breach of this Agreement as provided in Section 10 of this Agreement. The Grantor agrees to: (a) maintain the Collateral in good order, repair, and condition at all times; (b) timely pay all taxes, judgments, levies, fees, or charges of any kind levied or assessed on the Collateral; (c) timely pay all rent or mortgage payments of any kind as applicable to any real property upon which any part of the Collateral is located; and (d) have and maintain at all times a hazard insurance policy on the Collateral underwritten by an insurance company, and in an amount, approved by the Secured Party, but in no way shall the amount of insurance be less than the replacement cost of the Collateral. The insurance procured in this Section shall contain a standard Lender's Loss Payable Clause in favor of the Secured Party, and provide that the Secured Party will receive at least ten (10) business days' notice of any cancellation of the policy. The Grantor hereby assigns to the Secured Party all rights to any proceeds of any insurance procured under this Section, and authorizes the Secured Party to receive such payments and execute any and all documents required to receive such payments. If the Grantor fails to provide for the insurance as set out in this Section, the Secured Party, in addition to any remedies as set out in Section 10 of this Agreement, may procure the requisite insurance on the Collateral on its own behalf and charge the Grantor with any and all costs of such procurement.

9.    Perfection of Security Interest. The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral. The Grantor hereby authorizes the Secured Party to file or record any document necessary to perfect, continue, amend, or terminate its security interest in the Collateral, including, but not limited to, any financing statements, including amendments, authorized to be filed under the UCC, without signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor also hereby ratifies any previously filed documents or recordings regarding the Collateral, including but not limited to, any and all previously filed financing statements.

10.    Remedies. If an Event of Default shall have occurred and be continuing, the Secured Party may do any or all of the following: (a) declare all Secured Obligations immediately due and payable; (b) enter the Grantor's property where the Collateral is located and take possession of the Collateral without demand or legal process; (c) require the Grantor to assemble and make available the Collateral at a specific time and place designated by the Secured Party; (d) sell, lease, or otherwise dispose of the Collateral at any public or private sale in accordance with the law; and (e) enforce payment of the Secured Obligations and exercise any rights and remedies available to the Secured Party under law, including, but not limited to, those rights and remedies available to the Secured Party under Article 9 of the UCC.

11.    Secured Party Rights. Any and all rights of the Secured Party provided by this Agreement are in addition to any and all rights available to the Secured Party by law, and shall be cumulative and may be exercised simultaneously. No delay, omission, or failure on the part of the Secured Party to exercise or enforce any of its rights or remedies, either

3

Doc ID: a00741e0adf2d62215da132fc4e1194aff295b7e

granted under this Agreement or by law, shall constitute an estoppel or waiver of such right or remedy or any other right or remedy. Any and all rights of the Secured Party provided by this Agreement shall inure to the benefit of its successors and assigns.

12.     <u>Severability and Modification</u>. If any of the provisions in this Agreement is determined to be invalid, illegal, or unenforceable, such determination shall not affect the validity, legality, or enforceability of the other provisions in this Agreement. No waiver, modification or amendment of, or any other change to, this Agreement will be effective unless done so in a separate writing signed by the Secured Party.

13.     <u>Notices</u>. All notices, consents, claims, demands, waivers, and other communications hereunder ("Notices") shall be in writing and shall be deemed to have been effectively given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by FedEx or another nationally recognized overnight courier (receipt requested); (c) on the date sent by email (with confirmation of receipt from the intended recipient by return email or other written acknowledgment) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail (in each case, return receipt requested, postage pre-paid). Notices must be addressed to the parties at the addresses set forth on the first page of this Agreement (or to such other address that may be designated by a party from time to time in accordance herewith).

14.     <u>Entire Agreement</u>. This Agreement (including all documents referred to herein) represents the entire agreement between the Grantor and the Secured Party, and supersedes all previous understandings and agreements between the Grantor and the Secured Party, whether oral or written, regarding the subject matter hereof.

15.     <u>Jurisdiction</u>. This Agreement will be interpreted and construed according to the laws of the District of Columbia, including, but not limited to, the UCC, without regard to choice-of-law rules in any jurisdiction.

[*Signature page follows.*]

4

Doc ID: a00741e0adf2d62215da132fc4e1194aff295b7e

IN WITNESS WHEREOF, the undersigned Grantor and Secured Party have executed this Security Agreement as of the date first above written.

**GRANTOR**

Cracked Eggery, Inc., as Grantor

By:_____ (Signature)

Name: George Brickelmaier
Title:    Chief Executive Officer

**SECURED PARTY**

Donald H. Patterson, III Revocable Trust, as Secured Party

By:_____ (Signature)

Name: Donald H. Patterson, III
Title: Trustee

5

Doc ID: a00741e0adf2d62215da132fc4e1194aff295b7e

IN WITNESS WHEREOF, the undersigned Grantor and Secured Party have executed this Security Agreement as of the date first above written.

**GRANTOR**

Cracked Eggery, Inc., as Grantor

By:_____ (Signature)
Name:
Title:

**SECURED PARTY**

Donald H. Patterson, III Revocable Trust, as Secured Party

By: *Donald H. Patterson III* (Signature)
Name: Donald H. Patterson, III
Title: Trustee

5

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Security Agreement, Doc 4/6 |
| **FILE NAME** | Patterson _ Crack...04(5) (Final).pdf |
| **DOCUMENT ID** | a00741e0adf2d62215da132fc4e1194aff295b7e |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| **SENT** | **06 / 23 / 2021**<br>16:46:58 UTC | Sent for signature to George Brickelmaier<br>(ross@crackedeggery.com) from hg@tresquire.com<br>IP: 108.31.39.173 |
| **VIEWED** | **06 / 23 / 2021**<br>16:51:10 UTC | Viewed by George Brickelmaier (ross@crackedeggery.com)<br>IP: 107.72.178.176 |
| **SIGNED** | **06 / 23 / 2021**<br>16:51:25 UTC | Signed by George Brickelmaier (ross@crackedeggery.com)<br>IP: 107.72.178.176 |
| **COMPLETED** | **06 / 23 / 2021**<br>16:51:25 UTC | The document has been completed. |

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT SUBMITTER (optional) <br> Sarah Gay, (757) 624-3201 | |
| B. E-MAIL CONTACT AT SUBMITTER (optional) <br> sdgay@kaufcan.com | |

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

⌐ Sarah Gay, c/o Kaufman & Canoles, P.C. ⌐
150 West Main Street, Suite 2100
Norfolk, VA 23510
∟                                              ∟

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME <br> Cracked Eggery, Inc. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS <br> 1921 8th Street NW, Suite 110 | CITY <br> Washington | STATE <br> DC | POSTAL CODE <br> 20001 | COUNTRY <br> USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME <br> Donald H. Patterson, III Revocable Trust | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS <br> 830 Chester Avenue | CITY <br> Annapolis | STATE <br> MD | POSTAL CODE <br> 21403 | COUNTRY <br> USA |

4. COLLATERAL: This financing statement covers the following collateral:

All personal and fixture property of every kind and nature including all goods (including inventory, equipment, and any accessions thereto), instruments (including promissory notes), documents (whether tangible or electronic), accounts (including health-care insurance receivables), chattel paper (whether tangible or electronic), money, deposit accounts, letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, supporting obligations, and other contracts rights or rights to the payment of money, insurance claims and proceeds, tort claims, and all general intangibles (including all payment intangibles).

5. Check only if applicable and check only one box:   Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Washington, DC Recorder of Deeds  (#146396/JBW)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

```
Doc #: 2023109442
Filed & Recorded
12/08/2023 08:47 AM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS
   RECORDING FEES          $25.00
   SURCHARGE               $6.50
TOTAL:                     $31.50
```

**<u>Exhibit C</u>**

# CRACKED EGGERY, INC.
## SHAREHOLDERS' AGREEMENT

**THIS SHAREHOLDERS' AGREEMENT** (the *"Agreement"*) is dated and made on June 22, 2021, (the *"Effective Date"*) by and between Cracked LLC, a District of Columbia limited liability company (*"Cracked LLC"*) and Donald H. Patterson, III Revocable Trust, with an address at 830 Chester Avenue, Annapolis, Md. 21403 (*"Patterson"*), and Cracked Eggery Inc., a District of Columbia corporation (the *"Corporation"*).  The parties hereto are referred to singularly as the *"Party"* and collectively as the *"Parties."*

## RECITALS:

**WHEREAS**, the Corporation was incorporated in the District of Columbia under the District of Columbia Business Corporation Act of 2010, as amended (the *"Act"*); and

**WHEREAS**, the Shareholders of the Corporation have decided to enter into this Agreement to govern their respective interests, obligations, liabilities, ownership, and rights in the Corporation;

**NOW THEREFORE**, in consideration of the premises and mutual covenants and promises in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## ARTICLE I—DEFINITIONS

**1.01 Definitions.**

a. *"Affiliate"* means any entity, individual, firm, corporation, or organization, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Shareholder.  For the purposes of this definition "control" shall mean the direct or indirect power to direct the management and policies of such person or entity, whether through the ownership of voting securities, by contract, or otherwise.

b. *"Agreement"* means this Shareholder Agreement, including any schedules attached hereto.

c. *"Articles"* means the Corporation's Articles of Incorporation.

d. *"Board"* means the Directors acting as the board of directors of the Corporation.

e. *"Business"* means a restaurant or group of restaurants (including traditional "brick and mortar" as well as mobile food service operations) providing food and beverage service for profit.

f. *"By-laws"* means the by-laws of the Corporation as of the date of this Agreement and as may be amended from time to time.

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

g. **"Director"** shall mean any voting member of the Board.

h. **"Disposition"** means the sale, transfer (whether by gift or devise, intestate succession, operation of law, or otherwise), assignment, or other disposition or mortgage, hypothecation, pledge, or other encumbrance of a Shareholder's Shares.

i. **"Fair Market Value"** means the fair market value as determined pursuant to this Agreement.

j. **"Financial Statements"** means the financial statements of the Corporation, prepared in accordance with generally accepted accounting principles.

k. **"Major Dispute"** means a dispute between Shareholders and/or Shareholder Appointed Directors, which threatens permanent harm to the Corporation as a going concern.

l. **"Monthly Net Profit"** means the Corporation's net income or profits determined in accordance with generally accepted accounting principles, without any reduction for taxes based upon income, as calculated for and allotted to a given calendar month, after provision has been made for (i) payment of all operating expenses of the Corporation as of such time, and (ii) provision for such reserves as the Board deems necessary or appropriate for the Corporation's operations.

m. **"Patterson Loan"** shall have that meaning ascribed to it in Section 10.01 of this Agreement.

n. **"Securities"** means any Share and any security that may be converted into Shares or stock or that gives the holder of the security the right to have Shares issued to it (including options and warrants).

o. **"Share"** or **"Shares"** refers to one or more shares in the capital stock of the Corporation.

p. **"Shareholder"** means any one of the Shareholders who is now or later becomes a Shareholder in the Corporation.

q. **"Shareholders"** mean any two or more of the Shareholders who are or later become Shareholders in the Corporation.

r. **"Special Resolution of the Directors"** shall mean a resolution passed at a properly constituted meeting of the Board of Directors of the Corporation, at which sixty-six percent (66%) of Directors in attendance are in favor of such resolution, or, in lieu of such vote, a resolution which is consented to in writing by signatures of all the Directors of the Corporation.

s. **"Store"** means and refers to anticipated 'brick and mortar' locations for the Business, whether previously negotiated or anticipated in the future, each individual location being a "Store", and multiple locations aggregated being the "Stores."

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

t. **"Super Majority Vote"** shall mean a resolution passed at a properly constituted meeting of the Shareholders of the Corporation, at which meeting more than eighty-five percent (85%) of the Shares are voted in favor of such resolution, or in lieu of such vote, a resolution which is consented to in writing by the signatures of all the Shareholders of the Corporation.

u. **"Voting Rights"** means rights to vote at a meeting of the Board of Directors (other than rights to vote only on the appointment of an administrator, on a resolution for the winding up of the Corporation, or on similar financial distress events).

## ARTICLE II—PURPOSE

**2.01 All Shares Accounted**. As of the date of this Agreement, the Shareholders listed on Schedule 1 to this Agreement are all the shareholders of the Corporation. The Shareholders are solely responsible for electing the Directors and Officers of the Corporation.

**2.02 Purpose.** The Shareholders are entering into this Agreement to provide for the management and control of the affairs of the Corporation, including the management of the business, division of profits, disposition of shares, and distribution of assets on liquidation.

**2.03 Shareholder Agreement**. This Agreement will govern the relationship of the Shareholders to the extent permitted by law. Where this Agreement requires that an act be done or a state of affairs be effected and that act is done or that state of affairs is effected by action of the Board, the requirement will be read as requiring the Shareholders to do everything in their power to bring about that act or effect that state of affairs and not as requiring the Board to comply with this Agreement. This Agreement is not intended to restrict the Board's power to manage and supervise the Corporation, nor is it intended to fetter the discretion of any of the Directors.

## ARTICLE III—CLASSES OF SHARES

**3.01 Classes of Shares.** With effect from the date of this Agreement, the Corporation shall have a single class of common stock Shares, provided that the Shareholders may, on a Super Majority Vote, decide to authorize or issue additional classes of Shares or additional Shares within this singular class of common stock Shares.

**3.02 Authorized Capital.** The total number of shares which the Corporation is authorized to issue is 100,000, provided that the Shareholders may by Super Majority Vote decide to authorize additional shares.

**3.03 Shares Subject to this Agreement.** The Shareholders hereto and as listed in Schedule 1 to this Agreement own the number of shares of common stock, and approximate percentage of ownership of the Corporation, as is listed in Schedule 1. The Shares so listed in Schedule 1 constitute all of the issued and outstanding Shares of capital stock of the Corporation, and the holders thereof shall be subject to the terms of this Agreement. Should the Shareholders acquire any additional capital stock of the Corporation in the future, such newly acquired Shares shall also be subject to this Agreement.

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

## ARTICLE IV—CONTRIBUTIONS, REMUNERATION, AND LOANS

**4.01 Determination of Net Profit or Loss.**  The net profits or net losses of the Corporation for each fiscal year will be determined on an accrual basis in accordance with generally accepted accounting principles.

**4.02 Retaining Net Income.**  The Corporation will retain such amount of its net income as the Board believes necessary to meet the financial needs of the Corporation, including, but not limited to, the development or expansion of the Business.

**4.03 Regular Distributions of Net Income.**  Subject to any retained earnings and to the statutory requirements related to corporate distributions, the net income of the Corporation may be distributed quarterly to the Shareholders in the form of a dividend in proportion to the number of Shares of the Corporation owned by them, regardless of class.  Such dividends shall be determined by the Board of Directors.  Shareholders may elect not to take a dividend, but instead offer the monies proposed to be distributed as a dividend as a loan to the Corporation on terms mutually agreed upon by such Shareholder and the Corporation.

**4.04 Shareholder Loans to the Corporation.**

 **a. Loan Conditions**.  A Shareholder may issue a loan to the Corporation only under the following terms and conditions, unless otherwise agreed upon by the Shareholders:

  i. If a majority of the Shareholders determine by written resolution that the Corporation requires additional funds to meet the Corporation's obligations to its creditors or to achieve the purpose for which the Corporation was incorporated, the Shareholders will provide the Corporation with an interest-free Shareholder loan (the **_"Loan"_**) in an amount that is sufficient to enable the Corporation to meet such obligations or objectives, as the case may be.  Each Shareholder will contribute to the Loan on a pro rata basis.  The Shareholders may exempt any Shareholder from contributing to the Loan, but if less than all of the Shareholders contribute to the Loan, the Shareholders who contribute to the Loan will be entitled to interest at a reasonable commercial rate.

  ii. The Parties agree that to the extent any of the terms and provisions of this Agreement conflict or are inconsistent with any of the terms and provisions of the Shareholder Loans, such terms and provisions of this Agreement shall supersede the conflicting terms and provisions of the Shareholder Loans.  Subject to the foregoing, the Shareholder Loans shall remain in full force and effect in accordance with their respective terms and provisions.

 **b. Repayment.**  Repayment of Shareholder loans by the Corporation shall occur when the Shareholders agree that there are enough corporate funds to pay the loan.  Loans to Shareholders shall be paid in order of priority with the oldest loan being paid first, unless the lending Shareholder waives such right to first payment.

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

**c. Patterson Loan Exempt.**  Notwithstanding anything to the contrary above, the terms, requirements, and limitations of this Section 4.04 shall not apple to the Patterson Loan.

**4.05 Financial Statements**.  The Corporation shall maintain accurate Financial Statements at its principal place of business, or such other place as the Board may designate from time to time.

## ARTICLE V—MANAGEMENT

**5.01 Governance.**

### a. Shareholder Election of Board of Directors

i. The Corporation shall be governed by a Board whose Directors are appointed by the Shareholders as provided in this Agreement.

ii. The Board's primary responsibility is to the Corporation to ensure the viability of the Corporation as distinct from protecting the interests of any specific Shareholders or groups of Shareholders.

iii. There will be an annual general meeting of Shareholders to appoint the Board for the ensuing year.

### b. Board of Directors Election of Executive Officers.

i. The Board will be responsible for appointing the President of the Corporation, who shall also serve as the Chief Executive Officer (the **"CEO"**) and who shall report to the Board on a regular basis.  The President/CEO must (A) unless all Shareholders agree otherwise, be one of the Shareholders, and (B) as a condition of appointment agree to step down from his or her role without any right to compensation if his or her removal is approved under Section 5.06.

ii. The Board will be responsible for appointing the Treasurer of the Corporation, who shall also serve as the Chief Financial Officer (the **"CFO"**) and who shall report to the Board on a regular basis.

iii. The Board will be responsible for appointing the Secretary of the Corporation, who shall report to the Board on a regular basis.

iv. The Board may appoint other executive officers as it deems necessary.

**5.02 Composition of the Board.**  The Shareholders shall vote their Shares so that the Board shall initially be composed of four (4) directors, three (3) of whom shall be nominated and elected by Cracked LLC, and one (1) of whom shall be an individual nominated and elected by Patterson, so long as Patterson owns shares of the Corporation, or (b) the Patterson Loan remains outstanding.

**5.03 Director Obligations.** Every Director of the Corporation shall exercise the powers and discharge the duties of their office honestly, in good faith, and in the best interests of the

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

Corporation, and in connection therewith shall exercise the degree of care and diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

**5.04 Removal of Directors**.  In the event that a nominee to the Board shall fail to vote and act as a Director to carry out the provisions of this Agreement, then the Shareholders agree to exercise their right as Shareholders of the Corporation in accordance with the Articles of Incorporation to remove such nominee from the Board and to elect in the place or stead thereof such individual who will use his/her best efforts to carry out the provisions of this Agreement, but only in the event that the Shareholder whose nominee has been removed fails to appoint a successor within a period of twenty one (21) days from the date such nominee has been removed. The director nominated by Patterson may only be removed by Patterson.

**5.05 Compensation of the Board and Executives.**  The Directors will decide, by a unanimous resolution of the Directors, on compensation, if any, for each of the Directors.

**5.06 Matters Requiring Board Approval by Special Resolution of the Directors.**  The following matters require the approval of the Board by Special Resolution of the Directors.  If any matter arises that is not included herein and if there is any uncertainty as to who should deal with such a matter, it will be the responsibility of the Board to so decide (without the need for a Special Resolution of the Directors).

> a. Appointment or removal of the President/Chief Executive Officer of the Corporation.  A Chief Executive Officer must:

> > i. unless all Shareholders agree otherwise, be one of the Shareholders; and

> > ii. must as a condition of appointment agree to step down from the role without any right to compensation if his or her removal is approved under this Section 5.06.

> b. Appointment and determination of auditors and advisors of the Corporation;

> c. The lending of any money, the provision of any guarantee, indemnity, or other contingent commitment or the grant of any security over the Business or the assets of the Corporation, other than in the ordinary course of business;

> d. Any transaction with a related party of the Corporation or any Director or Shareholder; and

> e. Any material changes to any dividend policy of the Corporation.

**5.07 Matters Requiring Approval by Shareholder Super Majority Vote.**  The following matters require the approval of a unanimous vote of the aggregated Shareholders:

> a. The issue of Securities, or the entry into any agreement requiring the issue of Securities, or the issue of equity interests, or the entry into any agreement requiring the issue of equity interests, of the Corporation or any subsidiary of the Corporation, other than an issue offered pro rata to all Shareholders;

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

b. The issue, redemption, or purchase of any Shares or any equity interests of the Corporation or any subsidiary of the Corporation;

c. The determination and fixing of salaries and compensation of the Officers of the Corporation, whether as Officers or in each such Officer's capacity as an employee of the Corporation;

d. The acquisition in a single transaction or series of related transactions of any assets, business, or any shares or interests in any company exceeding $25,000, or the divestiture in a single transaction or series of related transactions of all or substantially all of the business or assets of the Corporation;

e. The liquidation or dissolution of the Corporation;

f. Any material change in the nature of the Business;

g. Any change to the rights, preferences or privileges related to the Corporation's stock;

h. The taking of any act in contravention of this Agreement; or

i. Any change to the number of Directors.

## ARTICLE VI—WITHDRAWAL, DEPARTURE, AND RESTRICTIONS ON TRANSFER

**6.01 Shares Acquired for Investment.**  Each of the Shareholders acknowledges and represents that he, she or it has obtained and accepted his, her or its Shares in good faith, for investment and for his, her, or its own account, and not with a view to distribution or resale.

**6.02 Restrictions on Transfer.**  To accomplish the purposes of this Agreement, Shareholders will not (and will not agree to) directly or indirectly sell, assign, transfer, give, pledge, hypothecate, or otherwise dispose of or in any other way encumber any Shares or any interest in any Shares and will not create any security interest in or grant any option with respect to any Shares or any interest in any Shares, except in accordance with the express provisions of this Agreement or except with the prior written approval of all Shareholders; any transfer, sale, assignment, or encumbrance of any of the shares of the Corporation, other than according to the terms of this Shareholder Agreement, is void.

**6.03 Permitted Transfers.**

a. Subject to the conditions and restrictions set forth in this Section 6.03, a Shareholder may at any time make a Disposition of all (but not less than all) of his, her, or its Shares to (any such Disposition being referred to in this Section 6.03 as a *"Permitted Transfer,"* and any transferee of the Shares pursuant to such a transfer being referred to as a *"Permitted Transferee"*): (i) an Affiliate of the transferring Shareholder, (ii) in the case of a Shareholder that is an individual, a trust or trusts for the exclusive benefit of such Shareholder, (iii) the executor, administrator, trustee, or personal representative to whom such Shareholder's Shares are transferred upon such Shareholder's death; (iv) in the case of a Shareholder that

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

is: (A) a partnership to its partners or former partners in accordance with partnership interests, (B) a corporation to its shareholders in accordance with their interest in the corporation, (C) a limited liability company to its members or former members in accordance with their interest in the limited liability company, or (v) any third party if the transfer complied with the requirements of Sections 6.04 and 6.05 of this Article VI.

b. A Disposition will not be treated as a Permitted Transfer under Section 6.03(a) unless and until each of the following conditions is satisfied or waived by the Board: (i) the transferor and transferee will execute and deliver to Corporation such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer and to confirm the agreement of the transferee to be bound by the provisions of this Agreement, and (ii) the offering Shareholder shall have furnished Corporation with an opinion of counsel, reasonably satisfactory to Corporation, that such Disposition will not require registration of such shares under the Securities Act of 1933, as amended, or the securities laws of any other applicable jurisdiction.

## 6.04 Shareholders' Right of Second Opportunity.

a. No Shareholder may make a Disposition of all or part of its Shares to a person or entity that is not a Shareholder without compliance with Section 6.04(b).

b. If a Shareholder wishes to make a Disposition of all or a part of its Shares to a person or entity that is not a Shareholder, it shall give the other Shareholders a ***"Selling Notice,"*** specifying in writing the Shareholder's desire to sell. The other Shareholders shall have the second option to purchase all of the offered Shares, subject to Section 6.05, at the same price offered to any non-Shareholder buyer, or as determined in accordance with Section 6.05(b) if the value cannot be initially agreed upon by the Parties, whichever is higher, and upon the conditions and terms set forth in Section 6.05(c). The option may be exercised by giving notice to the offering Shareholder within thirty (30) days after the value has been determined. If more than one Shareholder desires to purchase they may purchase all of the offered Shares on a pro rata basis, unless they otherwise agree. The closing of the purchase shall be not more than thirty (30) days after the exercise of the option unless otherwise agreed upon by the buying and selling Shareholders. If no Shareholder elects to purchase, then the offering Shareholder may make a Disposition of all of the offered Shares at any negotiated value to any qualified buyer, provided, however, that, if requested by Corporation, the offering Shareholder shall have furnished Corporation with an opinion of counsel, reasonably satisfactory to Corporation, that such Disposition will not require registration of such shares under the Securities Act of 1933, as amended, or the securities laws of any other applicable jurisdiction.

## 6.05 Redemption.

a. In the event a Shareholder gives a Selling Notice pursuant to Section 6.04(b), the Corporation shall have the first option to purchase that Shareholder's Shares at the same price offered to any non-Shareholder buyer, or at a price equal to the fair market value of the Shares as determined as set forth in Section 6.05(b) below. The option shall be exercised by written notice to the Shareholder given within thirty (30) days after the value has been determined as set forth below, with closing to be within fifteen (15) days after the giving of

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

notice of exercise.  If the Corporation elects not to purchase the Shareholder's Shares, the other Shareholders shall have the option to purchase the Shareholder's Shares as set forth in Section 6.04(b) and upon the terms and conditions in 6.05(c).

b. For the purposes of determining the fair market value of a Shareholder's Shares, the fair market value will be determined as follows:

i. The Shareholder or Shareholders desiring the valuation will give written notice to all other Shareholders that a valuation is required (the **"Valuation Notice"**).

ii. The Valuation Notice will specify the reason for the valuation and name three (3) companies or persons that specialize in and have substantial experience in business valuation that are at arm's-length from all Parties (the **"Potential Valuators"**).

iii. The Shareholders receiving the Valuation Notice will select one of the Potential Valuators to act as the valuator (the **"Valuator"**).

iv. The Valuator will value the Shares in accordance with generally accepted accounting principles.

v. The Shareholders will share the cost of valuation on a pro rata basis.

c. The purchase price, if the option is exercised, shall be payable as follows:

i. twenty percent (20%) of the purchase price shall be paid at closing in cash or by bank check or checks drawn on a national bank;

ii. the balance of the purchase price shall be paid by delivering a promissory note to the Corporation dated as of the closing date and bearing interest at the prime rate as set forth in the Wall Street Journal on the date of closing, plus three percent (3%), and such note shall be payable in three (3) equal annual installments beginning one (1) year from closing and with the interest being payable at the time of payment of each principal installment.

**6.06 Cross Purchase.**  If any Shareholder wishes to sell all or any portion of their Shares to another Shareholder, the selling Shareholder must first provide all the Shareholders with a Selling Notice, specifying the Shareholder's desire to sell.  If more than one Shareholder desires to purchase they may purchase all of the offered Shares on a pro rata basis, unless they otherwise agree.  If the value cannot initially be agreed upon by the Parties, the value shall be determined in accordance with Section 6.05(b) of this Agreement, and upon the conditions and terms set forth in Section 6.05(c).

## ARTICLE VII—PRE-EMPTIVE RIGHTS

**7.01 Pre-Emptive Rights**.  Notwithstanding the Articles of Incorporation of the Corporation, the following shall apply to the allotment and issuance by the Corporation of any Shares:

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

a. If the Corporation proposes to issue further shares (the *"Issued Shares"*), the Issued Shares shall be offered to the Shareholders at a price and upon terms determined by the Board of Directors.  The Corporation shall give written notice (the *"Issuing Notice"*) to each of the Shareholders, setting forth the price at which, and the terms on which the Issued Shares are being offered.

b. Each Shareholder wishing to purchase part or all of the Issued Shares should notify the Corporation in writing (paper or electronically).

c. If any Shareholders accept the offer stated in the Issuing Notice, the Shareholders shall subscribe for the Issued Shares in accordance with the Issuing Notice and shall execute a written subscription in accordance therewith which shall be accepted forthwith by the Corporation.  The Shareholders shall be entitled to subscribe for and purchase the Issued Shares in such proportions as they may agree upon, or, in default of such agreement, on a pro rata basis in relation to their respective Shares.

d. Any Issued Shares which are not subscribed for by the Shareholders in accordance with this Article VII may be offered by the Corporation to a third party at the price and on the terms in the Issuing Notice, provided that no subscription shall be accepted by the Corporation for the sale of any such shares to a third party except with the written consent of the holders of not less than a Super Majority Vote of the Shareholders.

e. The Board, upon determining it in the Corporation's interest to issue the Issues Shares to a third-party, may do so without an Issuing Notice and without any pre-emptive right of the Shareholders with the unanimous written consent of the Shareholders.

## ARTICLE XIII—TAG-ALONG & DRAG-ALONG

**8.01 Tag-Along.**  If a transaction involving the sale of Shares to a person, firm, partnership, association, or other entity that was not previously a Shareholder of the Corporation (a *"Third Party"*) will result in the Third Party acquiring fifty percent (50%) or more of the Shares in the Corporation, the selling Shareholder or Shareholders (*"Selling Shareholder"*) will not be entitled to sell the Shares unless the Third Party offers the following options to each remaining Shareholder (*"Remaining Shareholder"*):

a. The Third Party will offer to purchase any Remaining Shareholder's Shares.  This offer will remain open for a period of thirty (30) days from the date on which the Third party first acquires Shares in the Corporation.

b. If the Remaining Shareholder is selling Shares of the same class and series as the Shares purchased by the Third Party, the price per share will be the same.

c. If the Remaining Shareholder is selling Shares of a class or series other than the Shares purchased by the Third Party, the price will be the Fair Market Value of the Shares.  If the Fair Market Value of the Shares is unknown, the Third Party will bear the cost of determining the Fair Market Value of the Shares.

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

d. The Third Party will purchase the Remaining Shareholder's Shares on terms that are substantially similar to and not less favorable to the Remaining Shareholder than those in the transaction between the Selling Shareholder and the Third Party.

Notwithstanding anything to the contrary in this paragraph, this Section 8.01 shall not apply to any Permitted Transfer to an Affiliate of the Selling Shareholder.

**8.02 Drag-Along.**  In the event that Shareholders collectively owning greater than fifty percent (>50%) of issued and outstanding Shares of the Corporation (collectively *"50+% Shareholders"*) receive a Bona Fide Offer (as defined below) to sell their Shares to a third party, then such 50+% Shareholders may send a written notice to the other Shareholders specifying the name of the purchaser, the consideration payable, a summary of the material terms of such proposed purchase and copies of all documents related to such proposed purchase.  Each other Shareholder shall have the option, by providing notice within thirty (30) days after receipt of such notice, of matching such Bona Fide Offer, on the same terms and conditions of such offer.  If any or all other Shareholders (a *"Purchasing Shareholder"* or *"Purchasing Shareholders"*) seek to exercise such option, then the Purchasing Shareholder(s) shall purchase all of the 50+% Shareholders' Shares, if purchased by more than one Shareholder, on a pro rata basis calculated on the number of Shares owned by each Purchasing Shareholder.  If no other Shareholders exercise such option, then the other Shareholders shall be obligated to (i) sell all of their Shares free of any encumbrance in the transaction on the same terms and conditions as the 50+% Shareholders (including payment of each such other Shareholder's pro rata share of all costs associated with such transaction), and (ii) otherwise take all necessary action to cause the consummation of such transaction, including voting their Shares in favor of such transaction and not exercising any other rights in connection therewith. Each Shareholder further agrees to take all actions (including executing documents) in connection with consummation of the proposed transaction as may reasonably be requested of it by the 50+% Shareholders, and (ii) hereby appoint the 50+% Shareholders, acting jointly, as his, her, or its attorney-in-fact to do the same on its behalf. For the purposes of this Agreement, a *"Bona Fide Offer"* shall mean and refer to a good faith offer in writing to purchase Shares by a person who or which is not affiliated with or related to, any Shareholder(s), providing that any purchase in connection therewith shall be subject to the terms and provisions of this Agreement and setting forth all other relevant terms and conditions of the proposed purchase. The 50+% Shareholders shall keep the other Shareholders advised in writing of, and consult on a timely basis with, the other Shareholders concerning the subject transaction. If a sale is not consummated within 120 days after the date of the initial notice from the 50+% Shareholders, then the other Shareholders shall no longer be obligated to sell their Shares pursuant to that specific notice, but shall remain subject to the provisions of this Section 8.02 with respect to any subsequent transfer to which the Drag-Along Rights would apply.

## ARTICLE IX—RISK OF FORFEITURE

**9.01. Risk of Forfeiture.**

a. Upon the happening of any of the events enumerated below, the Corporation shall purchase for $1 all of the Shares of the Shareholder so affected:

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

i. If any Shareholder makes any assignment for the benefit of creditors or applies for the appointment of a trustee, a liquidator, or a receiver, or commences any proceeding related to him, her, or itself under any bankruptcy or arrangement of a similar law; or if any such application is filed or proceedings commenced against the Shareholder and the Shareholder consents thereto or an order is entered allowing such application and remains in effect for sixty (60) days; or

ii. If the Shares of any Shareholder are purported to be transferred involuntarily, including, without limitation, any purported transfer by or pursuant to bankruptcy, divorce, equitable distribution, or operation of law.

b. This duty to purchase or retire shall apply to all, but not less than all of the shares, and shall be exercised by the Corporation by serving written notice upon such Shareholder or upon such Shareholder's legal representative within thirty (30) days after the Corporation receives notice of the occurrence of such event or the qualification of such legal representative, whichever is later.

## ARTICLE X—PATTERSON LOAN

**10.01 Patterson Loan.**  As a material inducement for Corporation to enter into this Agreement, without which Corporation would not enter into this Agreement, Patterson (through the Donald H. Patterson, III Revocable Trust ) hereby agrees to loan the Corporation an aggregate amount of 1,000,000 dollars (the ***"Patterson Loan"***).  The Patterson Loan will be used to finance the creation (including the "build-out") and initial operation of two (2) Stores, and shall be documented by the loan documents attached hereto as Exhibit A.

## ARTICLE XI—NON-SOLICITATION & NON-COMPETE

**11.01 Non-Solicitation.**  Each Shareholder agrees that while a Shareholder, director, officer, or employee of the Corporation and for a period of one (1) year after ceasing to be a Shareholder, director, officer, or employee of the Corporation, the Shareholder will not in any way, directly or indirectly, induce any Shareholder, director, officer, or employee of the Corporation (or any employee of the Corporation's subsidiaries), to leave their position with the Corporation or to compete in any way with the Corporation and will not interfere with the Corporation's relationship with its other Shareholders, directors, officers, or employees.  Such enticement or interference would be harmful and damaging to the Shareholders and to the Corporation.

**11.02. Non-Compete.**  For a period of twelve (12) months following a Shareholder's withdrawal, removal, sale of Shares, or other exit from ownership of the Corporation (the ***"Restricted Period"***), the Shareholder shall not, directly or indirectly, alone or through an affiliate, open a restaurant or other food service business substantially similar to the Business of the Corporation within a radius of 1.5 miles of any existing restaurant, food production facility, or other food service and sales component of the Corporation; provided, however, that the foregoing shall not be deemed to prevent the ownership by the Shareholder of up to five percent (5%) of any class of securities of any corporation or business entity which does the same.

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

**11.03 Survival.** The terms of Sections 11.01 and 11.02 shall survive termination of this Agreement.

## ARTICLE XII—MAJOR DISPUTES

**12.01 Notice of Dispute.** If a Shareholder in good faith considers a Major Dispute has arisen, it must give notice to the other Shareholders (*"Major Dispute Notice"*) summarizing the matters in dispute and the effect the Shareholder considers this has on the Corporation.

**12.02 Good Faith Negotiations.** If a Major Dispute Notice is given, the Parties must use their best endeavors to resolve the matters in dispute by good faith negotiations.

**12.03 Mediation.** If good faith negotiations do not resolve the matters in dispute within ten (10) business days of a Major Dispute Notice being given, any Shareholder may by notice to the other Shareholders require the dispute to be referred to mediation, in which case the mediation will be conducted in Washington, DC by an single, independent mediator and at a fee agreed to by each Party. If the Shareholders cannot agree on the mediator, each Shareholder shall select a mediator and such mediators shall together unanimously select a neutral mediator who will conduct the mediation. Each Shareholder shall bear the fees and expenses of its mediator and all the Shareholders shall equally bear the fees and expenses of the final mediator. The decision of the mediator shall be final and binding on the Shareholders.

**12.04 Obligations Continue.** Despite the existence of a dispute and the operation of this Article XII, each Party must, to the extent possible, continue to perform its obligations under this Agreement.

**12.05 Urgent Relief.** This Article XII does not affect any Party's right to seek urgent interlocutory and/or injunctive relief from any District of Columbia court of competent jurisdiction.

**12.06 Purchase.** If the matters in dispute are not resolved within sixty (60) days of the start of mediation (or any longer period agreed in writing by all Shareholders) then any Shareholder may offer to purchase all, but not less than all, of the Shares of any other Shareholder, or all other Shareholders (a *"Buy Out"*), so as to resolve the Major Dispute. The Shareholders shall negotiate in good faith for the conclusion of a Buy Out agreement, with the value determined under 6.05(b), or any other negotiated price, and under the terms and conditions of 6.05(c), or any other negotiated terms and conditions.

## ARTICLE XIII—NOTICE OF THIS AGREEMENT ON SHARE CERTIFICATES

**13.01 Notice of Agreement on Certificates**. Any and all share certificates issued by the Corporation will have subscribed on them the following notice, or a notice in substantially the following form:

> "The shares represented by this certificate are subject to the provisions of a shareholder agreement, made the ___ day of _____, 2021, which restrict the right to sell, transfer, or encumber any shares in the Corporation, including the shares represented by this certificate.

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

Notice of the said agreement is hereby given. A copy of the said agreement may be obtained by sending a written request to the Board of Directors for the Corporation."

## ARTICLE XIV—EFFECTIVE DATE AND TERM

**14.01 Effective Date.** This Agreement will come into effect on the date of its execution.

**14.02 Term.** This Agreement will remain in effect until the earlier of:

a. The date specified, in a written agreement, signed by all of the Shareholders, terminating this Agreement; or

b. The bankruptcy, winding-up, or dissolution of the Corporation.

## ARTICLE XV—AMENDMENTS

**15.01 Amendment.** This Agreement may only be amended or modified by a written agreement of all the Shareholders.

## ARTICLE XVI—GENERAL PROVISIONS

**16.01 Notices.** All notices required under this Agreement shall be in writing, and shall be deemed duly given (a) when delivered, if delivered personally, (b) at the end of the date after deposit if sent by overnight express courier service, (c) at the end of the third business day after deposit if sent by registered or certified mail, return receipt requested and postage prepaid, to the parties as set forth in the signature page below, or at such other address as may be supplied by similar notice, or (d) when sent, if by electronic mail.

**16.02 No Waiver.** No rights under this Agreement may be waived except by an instrument in writing signed by both parties.

**16.03 Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the District of Columbia applicable to agreement made and to be performed wholly within such jurisdiction, without giving effect to the provisions, policies or principles thereof relating to choice or conflict of laws.

**16.04 Binding Effect.** Except as provided otherwise herein, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective legal representatives, successors, and assigns.

**16.05 Severability.** If a provision of this Agreement is determined to be unenforceable in any respect, the enforceability of the provision in any other respect and of the remaining provisions of this Agreement will not be impaired.

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

**16.06 Headings.**  The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning of this Agreement.

**16.07 Expenses.**  All fees and expenses incurred by each party in connection with this Agreement and the transaction contemplated in this Agreement shall be borne by that party.

**16.08 Survival.**  All provisions of this Agreement that would be reasonably expected to survive the termination of this Agreement will do so.

**16.09 Attorney Fees.**  If any arbitration or litigation is instituted to interpret, enforce, or rescind this Agreement, including but not limited to any proceedings brought under the United States Bankruptcy Code, the prevailing party of a claim will be entitled to recover with respect to the claim, in addition to any other relief awarded, the prevailing party's reasonable attorney's fees and other fees, costs, and expenses of every kind.

**16.10 Attachments.**  All exhibits and other attachments referenced in this Agreement are part of this Agreement.

**16.11 Entire Agreement.**  This Agreement constitutes the entire agreement among the parties and supersedes and prior agreement or understanding among the parties concerning its subject matter.

**16.12 Assignment.**  This Agreement may not be transferred, assigned, pledged, or hypothecated by either party without the prior written consent of the other party.

**16.13 Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which shall constitute one agreement.  Furthermore, this Agreement may be executed by a party's signature transmitted by facsimile or by electronic mail, and copies of this Agreement executed and delivered by means of faxed or electronic mail shall have the same force and effect as copies hereof executed and delivered with original signatures.  All parties hereto may rely upon faxed or electronic mail as if such signatures were originals.

(REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK; SIGNATURES TO FOLLOW)

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

**WITNESS** the following authorized signatures:

**FOR CRACKED LLC:**                                          **FOR PATTERSON:**

_____    06 / 23 / 2021          _____  _____
Signature                             Date                       Signature                        Date


Andrew Zarinsky          President                               _____
Name, Title                                                      Name, Title



**FOR CRACKED EGGERY, INC.**

_____    06 / 23 / 2021
Signature                             Date


George Brickelmaier        Chief Executive Officer
Name, Title

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

**WITNESS** the following authorized signatures:

**FOR CRACKED LLC:**

_____     _____
Signature                                            Date

_____
Name, Title


**FOR PATTERSON:**

_Donald H. Patterson III_  _6/23/2021_
Signature                              Date

DONALD H. PATTERSON III, Trustee
Name, Title


**FOR CRACKED EGGERY, INC.**

_____     _____
Signature                                            Date

_____
Name, Title

**SCHEDULE 1**
**SHAREHOLDERS OF CRACKED EGGERY INC.**

The Shareholders own the number of shares of common stock, and approximate percentage of company ownership, as listed below:

|  | Number of Shares | Percentage of Ownership |
|---|---|---|
| Cracked DC LLC | 70,000 | 70% |
| Donald Patterson | 30,000 | 30% |
| Total Authorized Shares |  |  |
| Shares Issued and Outstanding | 100,000 | -- |

19508310v4

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

## SCHEDULE 2
## SUBSCRIPTION AGREEMENT

Doc ID: 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Shareholder Agreement, Document 1/6 |
| **FILE NAME** | Patterson _ Crack...10(4) (Final).pdf |
| **DOCUMENT ID** | 6d86cc38bbfbf146fad29c2b805364a5f1b3bb5f |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| **SENT** | **06 / 23 / 2021**<br>16:39:36 UTC | Sent for signature to George Brickelmaier (ross@crackedeggery.com) and Andrew Zarinsky (aj@crackedeggery.com) from hg@tresquire.com<br>IP: 108.31.39.173 |
| **VIEWED** | **06 / 23 / 2021**<br>16:42:43 UTC | Viewed by Andrew Zarinsky (aj@crackedeggery.com)<br>IP: 174.192.195.111 |
| **SIGNED** | **06 / 23 / 2021**<br>16:43:08 UTC | Signed by Andrew Zarinsky (aj@crackedeggery.com)<br>IP: 174.192.195.111 |
| **VIEWED** | **06 / 23 / 2021**<br>16:49:48 UTC | Viewed by George Brickelmaier (ross@crackedeggery.com)<br>IP: 107.72.178.176 |
| **SIGNED** | **06 / 23 / 2021**<br>16:50:14 UTC | Signed by George Brickelmaier (ross@crackedeggery.com)<br>IP: 107.72.178.176 |
| **COMPLETED** | **06 / 23 / 2021**<br>16:50:14 UTC | The document has been completed. |

**<u>Exhibit D</u>**

# Strategic Operations Assessment

Cracked Eggery, Washington DC

December 12-14, 2023



# Executive Summary

- Cracked Eggery is a brand that has a strong consumer following in the Washington DC market
- Customer Reviews are very strong on Yelp at over 4.5
- The concept has a simple menu built on high quality products with many products purchased through local vendors
- The concept can grow but needs to create operational systems & processes to improve operations and financial performance
- Leadership, Accountability, and Execution of Operations has not been defined and is negatively impacting the business
- Financial results are poor in large part due to heavy debt and operational inefficiencies
- Sales have been strong but have seen a drop YOY in Cleveland Park
- The company recently opened their 3rd location at Water Park in Crystal City



2

# Organizational Structure and Leadership

## *Current State*

- 3 Operating Owners & Investor
- 3 Restaurants each have 1 GM and Shift Leaders/Managers.  Total Salary for the 3 GM's is $215k for the year
- No Marketing/Social Media Strategy
- PR support available if needed
- Operating Owners involved in a variety of things to support the restaurants

## *Recommendations*

- Immediately define Ownership's Role within the restaurants to provide leadership and to drive results to positively impact profit and debt
- Create the Operating Structure in the restaurants
- Build a Marketing and Social Media Strategy
- Define who supports the restaurants in regard to R&M, HR, Marketing etc. to create accountability



3

# Assessment Focus

- Store-Level Operations
- Cost Improvements: Food Cost, Labor Cost, 3P Costs
- Systems, Tools, Processes, and Training
- Store-Level Reporting
- Key Performance Indicators
- Technology Platforms to Support the Business
- Organizational Structure
- Leadership of the Organization
- Financial Analysis
- Guest Experience



4

# Strengths

- Product Quality
- Menu Simplicity/Execution
- Sales Volumes
- Guest Feedback and Reviews
- Store Team Members
- Real Estate Locations & Rent
- Operating Hours
- Technology Platforms



# Opportunities

- Financial Results: Profitability/Debt

- Tools, Systems, Processes, and Training Programs (SOP's)

- Operating Manual

- Reporting and KPI's

- Brand Strategy

- Sales/Marketing Strategy

- Leadership

- Cost Controls



6

# Priorities

- Stop the Bleeding of the Financial Results, Build Profit
- Buildout Leadership Team and Accountabilities
- Implement Op's Systems, Tools, and Processes
- Build Sales to Improve Financial Performance
- Capital Structure



7

# Key Operational Findings

- ***Operating Tools/Systems***
- No Operating Manual
- No Opening/Closing/Cleaning Checklists
- No Food/Temp Quality Checklist
- Food Inventory is not happening
- Prep Lists not in existence nor par levels
- Order Guides not in use when ordering product
- No Waste Program
- No defined Training Program in place
- Food labeling inconsistent
- Building Schedules – No Productivity & Sales Projections
- Lacking tools and systems to verify product/portioning
- ***Technology Platforms***
- Good Tech platforms in place but not fully utilized

- ***Reporting***
- No Daily or Weekly Sales/Labor Report in use
- No Weekly Inventory for review
- GM's do not get P&L monthly for review
- Employee Meals and verification not in place
- Need weekly Projected Sales to build Weekly Schedules
- Need Weekly Labor Reporting vs. Projections
- KPI's are not part of the daily, weekly, or monthly process
- ***Kitchen Organization/Design***
- Kitchen Cleanliness and Organization an opportunity
- Walk-in organization at CP needs improvement
- Opportunity to evaluate line execution in Shaw vs CP with different line setups



# Recommendations

- ***Operating Tools/Systems***

- Utilize MarginEdge to create inventory sheets and waste sheets to help manage Food Cost

- Build order guides in MarginEdge along with par levels per restaurant

- Build Opening/Closing/Cleaning Checklists

- Build Temp Log and Food Quality Check Program

- Review tech apps such as Safety Culture to help build checklists and food quality programs

- ***Technology Platforms***

- Maximize the use of Toast and MarginEdge

- The data is there, and it needs to be used to help run a successful operation

- Full Tech Stack review

- ***Reporting***

- Use Toast for the data that is required to build daily, weekly, and monthly reporting

- Define daily, weekly, and monthly processes for reporting review with the restaurant operators

- Determine what KPI numbers will be used in Toast to measure the success of the business such as daily sales, average ticket, etc.

- ***Kitchen Organization/Design***

- Implement cleaning program

- Implement walk-in layout and organizational plan for product



9

# Key Operational Findings

- ***Training***
- Training is done through Institutional Knowledge
- No training materials exist
- No follow up with Trainees or testing
- GM's need training on systems and processes
- ***Food Cost***
- Team feedback is there is not much waste of product
- Team does not prioritize Food Cost
- Monitoring and measuring food quality is an opportunity (Cheese at CP)
- Product is not being checked thoroughly for quality when it is delivered to back door (Buns @ Shaw)

- ***Labor Cost***
- There is no set scheduling process in place for the GM's
- Projected sales and productivity are not part of the scheduling process
- GM's working roughly 40-45 hours per week
- Average employee wage is $18.50
- ***3P Cost***
- 3P sales account for 40-55% of total sales
- Recently got a deal with DoorDash at 17-18% fees
- Currently working with Uber Eats to establish a set fee



10

# Recommendations

- ***Training***

- Build Training Materials

- Define the Training Program – How to

- ***Food Cost***

- Develop a Food Cost Program from start to finish.

- Implement weekly Inventory & Waste Tracking Program

- Product Specification review

- Recipe Costing and Recipe Execution overview

- Supply Chain Review – US Foods program

- Food Cost mindset throughout the Team

- Build incentive programs with the Team for hitting certain Food Cost targets

- ***Labor Cost***

- Create a scheduling and review process for employee schedule with the GM's

- Add Sales Projections to the formula to build the employee schedule

- Develop a productivity module (SPMH)

- Move to a Wednesday-Tuesday schedule to maximize weekend labor and protect OT

- ***3P Cost***

- Review all 3P contracts and negotiate fee reduction where possible

- Introduction to Loop as a possible solution to help receive chargebacks



11

# BUILDING SALES AND A LEADERSHIP TEAM



12

# Building Sales

**_Current State - Sales & Profit thru November_**

- CP $1.32M (25.6% YOY)
- Shaw $1.79M (+38.7% YOY)
- Total: $3.11M (+1.6% YOY)
- Total Profit: ($350,121)
- Sales per Sq Ft: Forecast thru 2023

- CP – 1500 Sq Ft: $900-$950

- Shaw – 1600 Sq Ft:$1,150-$1,200

**_Sales Building Recommendations in 2024_**

- Catering Program
- Loyalty Program thru Toast
- Marketing Program
- Social Media Strategy
- Operational Execution
- Food Truck
- Menu Strategy
- Guest Experience
- Sales Culture with Team Incentives



13

# Recommendations

- ***Catering Program***
- Add a Coffee Program
- Promote Catering inside the 4 walls
- Build a Marketing Strategy
- ***Loyalty Program (Toast, 6,000 ppl currently)***
- Promote the Loyalty Program inside the 4 walls
- Build a Marketing Strategy
- Utilize the 6,000 people to promote the brand
- ***Marketing/Social Media Strategy***
- Create a Marketing and Social Media Strategy
- Investigate a Marketing Company for support
- ***Guest Experience***
- Define your service model
- Create an upselling sales strategy with incentives
- Dine in vs Take out packaging standards
- ***Incentive Program***
- Develop Sales Incentive Program based off sales targets

- ***Operational Execution***
- Must build standards around ticket times and SOS (10 minutes is too long)
- Institute tools, systems, and process to have the highest quality product
- ***Food Truck***
- Decide whether the Food Truck will be used for events or not
- If it will be used must build a strategy around how to use it and the impact on sales
- ***Menu Strategy***
- Define the Pricing Strategy for 2024 (Abe Froman, Mayor, Loaded Tots all went up $1 as of 12/15
- Opportunity to highlight certain sandwiches/bowls  which can have an impact on sales
- LTO's, New Products (Egg Whites, Burrito's, etc.)
- Beverage Program
- Price Comparison vs First Watch, Eggslut etc.



14

# Support for Recommendations

- **<u>Briana Benson – Business Dev & Project Manager</u>**
  - Project Integrator to organize and monitor all activities
- **<u>Becky Foulk – Culinary Development</u>**
  - Food Cost Cycle
  - Product Specifications, Recipe Execution
  - Standard Operating Procedures
  - Creation and Implementation of Culinary Systems
  - Toast, Margin Edge Reporting and Systems
- **<u>Lauren Cahill – Supply Chain</u>**
  - Product/Pricing Review
  - Product Negotiation with Broad Liner
- **<u>Michael Walters - Project Lead Operations</u>**
  - Operations Execution, Tools, Systems, Processes
  - Reporting, Financials
  - Support Development of Organization
  - Support RTS Team



15

Implementation

# TOOLS, SYSTEMS, PROCESSES



# Toast Sales Reporting







17

# Toast Labor Reporting





18

# MarginEdge Food Inventroy

**Cracked Eggery - Water Park: Food Inventory** | Printed: 12/17/2023 6:43PM

**Food Inventory**                                   Inventory Date: _____

## Food

### Bread

| Item | Report By | Price | Prev Count | Count |
|---|---|---|---|---|
| Bread, Challah Roll | Bag | $8.55 | | |

### Dairy

| Item | Report By | Price | Prev Count | Count |
|---|---|---|---|---|
| Butter, Salted | Pound | $3.75 | | |
| Cheese, American Sliced | Sleeve | $29.81 | | |
| Cheese, Cheddar Shredded | Pound | $4.11 | | |
| Cheese, Cheddar Sliced | Sleeve | $5.08 | | |
| Cheese, Fontina Shredded | Pound | $4.63 | | |
| Cheese, Goat | Sleeve | $10.26 | | |
| Cheese, Parmesan Grated | Pound | $7.54 | | |
| Cheese, Pepper Jack Sliced | Sleeve | $6.43 | | |
| Cheese, Queso Fresco | Pound | $4.76 | | |
| Cheese, Ricotta | Tub | $6.37 | | |
| Cheese, Swiss Loaf | LB (Pound) | $5.32 | | |
| Cream Cheese, Whipped | Tub | $10.60 | | |
| Crème Fraiche | Tub | $15.35 | | |
| Eggs, Whole | Dozen | $2.46 | | |
| Half & Half | Each | $3.60 | | |
| Milk, Oat | Each | $3.23 | | |
| Milk, Whole | Each | $3.78 | | |
| Sour Cream | Tub | $9.08 | | |

### Frozen

| Item | Report By | Price | Prev Count | Count |
|---|---|---|---|---|
| Potato, Hash Brown Patty | Pack | $10.09 | | |
| Potatoes, Tater Nuggets | Bag | $9.69 | | |

### Groceries

| Item | Report By | Price | Prev Count | Count |
|---|---|---|---|---|
| Beans, Black Bulk | Each | $5.88 | | |

**Cracked Eggery - Water Park: Food Inventory** | Printed: 12/17/2023 6:43PM

| Item | Report By | Price | Prev Count | Count |
|---|---|---|---|---|
| Sunflower Kernels Roasted & Salted | Pound | $7.18 | | |
| Syrup, Pancake | Each | $0.22 | | |
| Vanilla Extract | Each | $62.19 | | |
| Vinegar, Apple Cider | Each | $7.92 | | |
| Vinegar, Rice Wine | Gallon | $16.26 | | |
| Vinegar, White Wine | Gallon | $13.80 | | |
| Vinegar, Balsamic | Each | $16.35 | | |

### Poultry

| Item | Report By | Price | Prev Count | Count |
|---|---|---|---|---|
| Chicken, Tenders | Pound | $6.47 | | |
| Eggs, Liquid Whole | Box | $3.17 | | |

### Produce

| Item | Report By | Price | Prev Count | Count |
|---|---|---|---|---|
| Arugula, Baby | Bag | $6.30 | | |
| Arugula, Fresh | Pound | $4.61 | | |
| Avocados, Fresh | Each | $0.56 | | |
| Blueberries, Fresh | Each | $6.35 | | |
| Brussel Sprouts | Pound | $1.82 | | |
| Cabbage, Coleslaw Mix | Bag | $7.12 | | |
| Chives, Fresh | Pound | $17.25 | | |
| Cilantro, Fresh | Each | $0.85 | | |
| Delivery Fee - Below Minim Fee | Each | $10.00 | | |
| Dill, Fresh | Pound | $13.00 | | |
| Fuel Surcharge Fee | Other | $5.00 | | |
| Garlic, Peeled | Pound | $3.99 | | |
| Grapes, Red | Pound | $5.10 | | |
| Limes, Fresh | Each | $0.37 | | |
| Mint, Fresh | Each | $3.42 | | |
| Olives, Green | Gallon | $39.83 | | |
| Onion, White | Pound | $0.81 | | |
| Onions, Green/Scallions | Each | $1.01 | | |
| Onions, Red | Pound | $1.50 | | |
| Parsley, Fresh | Each | $0.92 | | |
| Peppers, Jalapeno | Pound | $3.80 | | |



19

# MarginEdge Waste Log



- Record waste daily
- Includes item and the reason for the waste
- Waste tracking critical for Food Inventory
- Total Waste summarization provided



20

# MarginEdge Waste Log







# MarginEdge Recipe Costing Tools

Menu Items: Cracked Eggery - Shaw (December 14 2023, 11:16:34 am)

| Name | Type | On Inventory | Cost | Menu Price | Net Profit | Cost - % | Source | Attachments |
|---|---|---|---|---|---|---|---|---|
| The Bubby | Sandwiches | No | $1.90 | $12.00 | $10.10 | 15.8% | MARGINEDGE | 1 |
| The Mayor | Sandwiches | No | $2.24 | $11.00 | $8.76 | 20.3% | MARGINEDGE | 0 |
| The Basic | Sandwiches | No | $1.63 | $8.00 | $6.37 | 20.4% | MARGINEDGE | 0 |
| The Abe Froman | Sandwiches | No | $2.33 | $11.00 | $8.67 | 21.1% | MARGINEDGE | 0 |
| Inigo Montoya | Sandwiches | No | $2.34 | $11.00 | $8.66 | 21.2% | MARGINEDGE | 0 |
| Kid's Meal (Grilled cheese) | Sandwiches | No | $1.73 | $8.00 | $6.27 | 21.6% | MARGINEDGE | 0 |
| Kid's Meal (Hamburger) | Sandwiches | No | $1.79 | $8.00 | $6.21 | 22.4% | MARGINEDGE | 0 |
| Willie's Hash | Sandwiches | No | $2.48 | $11.00 | $8.52 | 22.6% | MARGINEDGE | 0 |
| Southern Charm | Sandwiches | No | $2.77 | $12.00 | $9.23 | 23.1% | MARGINEDGE | 0 |
| Mr. Briggs Stuff | Sandwiches | No | $2.58 | $11.00 | $8.42 | 23.5% | MARGINEDGE | 0 |
| The Animal | Sandwiches | No | $3.19 | $13.00 | $9.81 | 24.5% | MARGINEDGE | 0 |
| Kid's Meal (Egg and Cheese) | Sandwiches | No | $1.99 | $8.00 | $6.01 | 24.9% | MARGINEDGE | 0 |
| Kid's Meal (Cheeseburger) | Sandwiches | No | $2.05 | $8.00 | $5.95 | 25.6% | MARGINEDGE | 0 |
| Cracked Burger | Sandwiches | No | $3.38 | $13.00 | $9.62 | 26% | MARGINEDGE | 0 |
| Green Eggs No Ham | Sandwiches | No | $2.63 | $10.00 | $7.37 | 26.3% | MARGINEDGE | 0 |
| Paulie Cicero | Sandwiches | No | $3.43 | $13.00 | $9.57 | 26.4% | MARGINEDGE | 0 |
| Shaved Ribeye Sandwich | Sandwiches | No | $3.44 | $13.00 | $9.56 | 26.5% | MARGINEDGE | 0 |
| The Hamilton Porter | Sandwiches | No | $3.54 | $13.00 | $9.46 | 27.3% | MARGINEDGE | 0 |
| The Frankis | Sandwiches | No | $2.26 | $8.00 | $5.74 | 28.3% | MARGINEDGE | 0 |
| The Green Jacket | Sandwiches | No | $2.42 | $8.00 | $5.58 | 30.2% | MARGINEDGE | 0 |
| Fried Chicken Sandwich | Sandwiches | No | $4.30 | $13.00 | $8.70 | 33.1% | MARGINEDGE | 0 |

Menu Items: Cracked Eggery - Shaw (December 14 2023, 11:16:48 am)

| Name | Type | On Inventory | Cost | Menu Price | Net Profit | Cost - % | Source | Attachments |
|---|---|---|---|---|---|---|---|---|
| Sausage & Gravy Tots | Bowls | No | $1.85 | $11.00 | $9.15 | 16.8% | MARGINEDGE | 0 |
| Bittersweet Symphony | Bowls | No | $2.03 | $10.00 | $7.97 | 20.3% | MARGINEDGE | 0 |
| The Seoul Mate | Bowls | No | $2.62 | $12.00 | $9.38 | 21.8% | MARGINEDGE | 0 |
| Loaded Breakfast Tots | Bowls | No | $2.55 | $11.00 | $8.45 | 23.2% | MARGINEDGE | 0 |
| Everyday I'm Brusselin' | Bowls | No | $2.92 | $11.00 | $8.08 | 26.5% | MARGINEDGE | 0 |
| St Elmo's Fire | Bowls | No | $3.36 | $12.00 | $8.64 | 28% | MARGINEDGE | 0 |
| Rancheros Cucamunga | Bowls | No | $3.69 | $12.00 | $8.31 | 30.8% | MARGINEDGE | 0 |



## Sales

| Entrees / Check | In Store | Online | 3PD |
|---|---|---|---|
| **1.5** | **42.5%** | **8.2%** | **28.1%** |
| 1.4 | 53.4% | 11.4% | 26.4% |

## Sales Builder

| Digital Avg | Total Drinks | Shakes | Mac & Cheese |
|---|---|---|---|
| **$26.07** | **43.7%** | **5.4%** | **8.1%** |
| $24.56 | 41.4% | 7.7% | 7.2% |

**KPI Reporting Examples**



23

## Prime Cost Productivity

| OT/Premium/Special | EPLH | SPLH | Chicken |
|---|---|---|---|
| $771 | 9.9 | $157.25 | 105.4% |
| $23,436 | 6.0 | $93.26 | 105.4% |

## Operations Metrics

| Google | Tattle CER | SOS In Store | SOS Digital |
|---|---|---|---|
| 4.8 | 4.8 | 8:57 | 9:22 |
| 4.6 | 4.5 | 7:21 | 7:56 |

**KPI Reporting Examples**



Shaw & Cleveland Park

# FINANCIAL ANALYSIS



25

# Cleveland Park P&L 2023 – November YTD

## Strengths

- Total Occupancy 5.3%

## Opportunities

- Sales (-25.6%) vs 2022

- Food Cost 32%

- Total COGS 30.1%

- Prime Costs (COGS/Labor) 64.2%

- G&A - 3P Fees $235,454 (17.9%)

- Other Expense – Interest $128,609

+$111,069 vs 2022

- Net Income (-$246,977) (-$133,412) vs 2022

**Cracked Store 2 LLC**
**Statements of Income and Expenses**
**For the One Month and Eleven Months Ended**
**November 20, 2023 and 2022**

| | Current Period | | | | | Positive/ (Negative) Outcome | Year-to-Date | | | | | Positive/ (Negative) Outcome |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | November 2023 | | | November 2022 | | | November 2023 | | | November 2022 | | |
| **Sales** | | | | | | | | | | | | |
| Food | 103,488 | 90.2% | | 124,884 | 90.2% | (21,396) | 1,178,133 | 89.5% | | 1,608,697 | 90.9% | (430,564) |
| Beverage | 11,302 | 9.8% | | 13,573 | 9.8% | (2,271) | 138,346 | 10.5% | | 160,611 | 9.1% | (22,265) |
| **Total sales** | **114,790** | **100.0%** | | **138,457** | **100.0%** | **(23,667)** | **1,316,479** | **100.0%** | | **1,769,308** | **100.0%** | **(452,829)** |
| **Cost of Sales** | | | | | | | | | | | | |
| Food | 33,865 | 32.7% | | 37,005 | 29.6% | 3,140 | 376,767 | 32.0% | | 509,204 | 31.7% | 132,437 |
| Beverage | 1,069 | 9.5% | | 5,683 | 41.9% | 4,614 | 18,995 | 13.7% | | 25,876 | 16.1% | 6,881 |
| **Total cost of sales** | **34,934** | **30.4%** | | **42,688** | **30.8%** | **7,754** | **395,762** | **30.1%** | | **535,080** | **30.2%** | **139,318** |
| **Employee Costs** | | | | | | | | | | | | |
| Salaries and wages | 33,690 | 29.3% | | 38,758 | 28.0% | 5,068 | 394,442 | 30.0% | | 518,395 | 29.3% | 123,953 |
| Employee benefits | 4,400 | 3.8% | | 6,443 | 4.7% | 2,043 | 55,489 | 4.2% | | 89,978 | 5.1% | 34,489 |
| **Total employee costs** | **38,090** | **33.2%** | | **45,201** | **32.6%** | **7,111** | **449,931** | **34.2%** | | **608,373** | **34.4%** | **158,442** |
| **Total Prime Costs** | **73,024** | **63.6%** | | **87,889** | **63.5%** | **14,865** | **845,693** | **64.2%** | | **1,143,453** | **64.6%** | **297,760** |
| **Gross Margin** | **41,766** | **36.4%** | | **50,568** | **36.5%** | **(8,802)** | **470,786** | **35.8%** | | **625,855** | **35.4%** | **(155,069)** |
| **Controllable Expenses** | | | | | | | | | | | | |
| Direct operating expenses | 8,729 | 7.6% | | 20,520 | 14.8% | 11,791 | 142,666 | 10.8% | | 236,841 | 13.4% | 94,175 |
| Utilities | 1,944 | 1.7% | | 2,367 | 1.7% | 423 | 30,977 | 2.4% | | 29,779 | 1.7% | (1,198) |
| Repairs and maintenance | - | 0.0% | | 137 | 0.1% | 137 | 13,209 | 1.0% | | 10,026 | 0.6% | (3,183) |
| Marketing and advertising | - | 0.0% | | - | 0.0% | - | 1,041 | 0.1% | | - | 0.0% | (1,041) |
| General and administrative | 30,245 | 26.3% | | 33,490 | 24.2% | 3,245 | 331,131 | 25.2% | | 370,286 | 20.9% | 39,155 |
| Other (income)/expense | 142 | 0.1% | | 2,943 | 2.1% | 2,801 | 124,484 | 9.5% | | 12,277 | 0.7% | (112,207) |
| **Total controllable expenses** | **41,060** | **35.8%** | | **59,457** | **42.9%** | **18,397** | **643,508** | **48.9%** | | **659,209** | **37.3%** | **15,701** |
| **Income/(Loss) Before Occupancy and Depreciation** | **706** | **0.6%** | | **(8,889)** | **(6.4%)** | **9,595** | **(172,722)** | **(13.1%)** | | **(33,354)** | **(1.9%)** | **(139,368)** |



# Cleveland Park P&L 2023 – October YTD

### *Misc. Items Increased vs 2022*

- Computer Supplies and Expense
- Dues and Subscriptions

### *Comments*

- Sales have been down each month vs 2022
- Store had construction impact in 2023
- YTD Sales Distribution
  - 89.5% Food Sales
  - 10.5% Beverage Sales

**Cracked Store 2 LLC**
Statements of Income and Expenses
For the One Month and Eleven Months Ended
November 20, 2023 and 2022

| | Current Period | | | | | Positive/ (Negative) | Year-to-Date | | | | | Positive/ (Negative) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | November 2023 | | November 2022 | | | Outcome | November 2023 | | November 2022 | | | Outcome |
| **Occupancy** | | | | | | | | | | | | |
| Rent | 5,400 | 4.7% | | 5,147 | 3.7% | (253) | 58,012 | 4.4% | 56,613 | 3.2% | | (1,399) |
| Real estate taxes | - | 0.0% | | - | 0.0% | - | 12,223 | 0.9% | 12,066 | 0.7% | | (157) |
| **Total occupancy** | 5,400 | 4.7% | | 5,147 | 3.7% | (253) | 70,235 | 5.3% | 68,679 | 3.9% | | (1,556) |
| **Operating Income/(Loss)** | (4,694) | (4.1%) | | (14,036) | (10.1%) | 9,342 | (242,957) | (18.5%) | (102,033) | (5.8%) | | (140,924) |
| **Depreciation** | 365 | 0.3% | | 1,332 | 1.0% | 967 | 4,020 | 0.3% | 11,532 | 0.7% | | 7,512 |
| **Net Income/(Loss)** | (5,059) | (4.4%) | | (15,368) | (11.1%) | 10,309 | (246,977) | (18.8%) | (113,565) | (6.4%) | | (133,412) |



27

# Shaw P&L 2023 – November YTD

## Strengths

- Sales 38.8% comp vs 2022

- Labor 7.1% improvement vs 2022

- Total Occupancy 5.8%

## Opportunities

- Food Cost 31.2%

- Total COGS 29.6%

- Prime Costs (COGS/Labor) 56.8%

- G&A - 3P Fees $408,754 (22.8%)

- Other Expense – Interest $86,808 vs 2022

- Net Income (-$103,144)

**Cracked Store 1 LLC**
**Statements of Income and Expenses**
**For the One Month and Eleven Months Ended**
**November 20, 2023 and 2022**

| | Current Period | | | | Positive/ (Negative) Outcome | Year-to-Date | | | | Positive/ (Negative) Outcome |
|---|---|---|---|---|---|---|---|---|---|---|
| | November 2023 | | November 2022 | | | November 2023 | | November 2022 | | |
| **Sales** | | | | | | | | | | |
| Food | 154,936 | 93.6% | 172,038 | 93.6% | (17,102) | 1,673,576 | 93.4% | 1,213,183 | 93.9% | 460,393 |
| Beverage | 10,574 | 6.4% | 11,678 | 6.4% | (1,104) | 118,668 | 6.6% | 78,542 | 6.1% | 40,126 |
| Total sales | 165,510 | 100.0% | 183,716 | 100.0% | (18,206) | 1,792,244 | 100.0% | 1,291,725 | 100.0% | 500,519 |
| **Cost of Sales** | | | | | | | | | | |
| Food | 46,474 | 30.0% | 48,269 | 28.1% | 1,795 | 521,914 | 31.2% | 377,418 | 31.1% | (144,496) |
| Beverage | 683 | 6.5% | 2,638 | 22.6% | 1,955 | 9,161 | 7.7% | 7,566 | 9.6% | (1,595) |
| Total cost of sales | 47,157 | 28.5% | 50,907 | 27.7% | 3,750 | 531,075 | 29.6% | 384,984 | 29.8% | (146,091) |
| **Employee Costs** | | | | | | | | | | |
| Salaries and wages | 35,834 | 21.7% | 48,011 | 26.1% | 12,177 | 430,687 | 24.0% | 391,208 | 30.3% | (39,479) |
| Employee benefits | 4,217 | 2.5% | 6,039 | 3.3% | 1,822 | 56,492 | 3.2% | 51,221 | 4.0% | (5,271) |
| Total employee costs | 40,051 | 24.2% | 54,050 | 29.4% | 13,999 | 487,179 | 27.2% | 442,429 | 34.3% | (44,750) |
| **Total Prime Costs** | 87,208 | 52.7% | 104,957 | 57.1% | 17,749 | 1,018,254 | 56.8% | 827,413 | 64.1% | (190,841) |
| **Gross Margin** | 78,302 | 47.3% | 78,759 | 42.9% | (457) | 773,990 | 43.2% | 464,312 | 35.9% | 309,678 |
| **Controllable Expenses** | | | | | | | | | | |
| Direct operating expenses | 7,284 | 4.4% | 12,229 | 6.7% | 4,945 | 131,246 | 7.3% | 98,780 | 7.6% | (32,466) |
| Utilities | 2,059 | 1.2% | 1,914 | 1.0% | (145) | 26,232 | 1.5% | 13,119 | 1.0% | (13,113) |
| Repairs and maintenance | 74 | 0.0% | - | 0.0% | (74) | 15,479 | 0.9% | 4,369 | 0.3% | (11,110) |
| Marketing and advertising | - | 0.0% | - | 0.0% | - | 958 | 0.1% | 101 | 0.0% | (857) |
| General and administrative | 42,379 | 25.6% | 36,873 | 20.1% | (5,506) | 474,546 | 26.5% | 238,663 | 18.5% | (235,883) |
| Other (income)/expense | 4,091 | 2.5% | 1,156 | 0.6% | (2,935) | 96,233 | 5.4% | 8,436 | 0.7% | (87,797) |
| Total controllable expenses | 55,887 | 33.8% | 52,172 | 28.4% | (3,715) | 744,694 | 41.6% | 363,468 | 28.1% | (381,226) |
| **Income/(Loss) Before Occupancy and Depreciation** | 22,415 | 13.5% | 26,587 | 14.5% | (4,172) | 29,296 | 1.6% | 100,844 | 7.8% | (71,548) |



# Shaw P&L 2023 – November YTD

***Misc. Items Increased vs 2022***
- Computer Supplies and Expense
- Accounting & Systems
- Paper Goods

***Comments***
- YTD Sales Distribution
  - 93.4% Food Sales
  - 6.6% Beverage Sales

**Cracked Store 1 LLC**
**Statements of Income and Expenses**
**For the One Month and Eleven Months Ended**
**November 20, 2023 and 2022**

| | Current Period | | | | Positive/ (Negative) Outcome | Year-to-Date | | | | Positive/ (Negative) Outcome |
|---|---|---|---|---|---|---|---|---|---|---|
| | November 2023 | | November 2022 | | | November 2023 | | November 2022 | | |
| **Occupancy** | | | | | | | | | | |
| Rent | 9,848 | 6.0% | 9,946 | 5.4% | 98 | 103,138 | 5.8% | 80,435 | 6.2% | (22,703) |
| Total occupancy | 9,848 | 6.0% | 9,946 | 5.4% | 98 | 103,138 | 5.8% | 80,435 | 6.2% | (22,703) |
| **Operating Income/(Loss)** | 12,567 | 7.6% | 16,641 | 9.1% | (4,074) | (73,842) | (4.1%) | 20,409 | 1.6% | (94,251) |
| **Depreciation** | 2,182 | 1.3% | 9,460 | 5.1% | 7,278 | 29,302 | 1.6% | 75,680 | 5.9% | 46,378 |
| **Net Income/(Loss)** | 10,385 | 6.3% | 7,181 | 3.9% | 3,204 | (103,144) | (5.8%) | (55,271) | (4.3%) | (47,873) |



29

# Financial Recommendations

- CPA Agreement

  - James McGehee, Financial Partner RTS

  - Setup conference call with James, Donald, and CPA

- Financial review of Water Park

  - RTS Team has not seen the financials

- Capital Structure defined with deliverables for all parties



# Tech Stack

- Toast

- Toast Payroll

- Margins Edge

- 7 Shifts

- Slack

- 3P: Ezcater, Uber Eats, Uber 1, DoorDash, DashPass, Grubhub



**<u>Exhibit E</u>**

Jeremy S. Williams (DC 994825)
Peter J. Barrett
Adolyn C. Wyatt
KUTAK ROCK LLP
1021 East Cary Street, Suite 810
Richmond, Virginia 23219
Telephone: (804) 644-1700
Facsimile: (804) 783-6192
*Counsel for the Donald H. Patterson, III Revocable Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CRACKED EGGERY INC., | ) Case No. 24-00416 (ELG) |
| | ) |
| Debtor. | ) Subchapter V |
| | ) |

### ORDER GRANTING MOTION TO DISMISS CASE

THIS MATTER comes before the Court upon the *Motion to Dismiss Case for Cause and Memorandum in Support Thereof* (the "Motion"), filed by the Donald H. Patterson, III Revocable Trust (the "Trust"), by counsel, pursuant to §§ 305 and 1112(b) of title 11 of the United States Code dismissing the bankruptcy case of the above-captioned debtor and debtor in possession (the "Debtor"); and it appearing that cause exists to grant the relief requested in the Motion and that such relief is in the best interests of the Debtor's estate, its creditors and other parties in interest; the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; proper notice of the Motion having been provided to all necessary and appropriate parties, and no further notice being necessary; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED, ADJUDGED and DECREED** that

1.      The Motion is granted.

2.      The above-captioned case is hereby dismissed.

3.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

4.      All necessary parties shall receive a copy of this Order via the Court's ECF system.

Dated:  _____

Washington, D.C.                        _____

                                        UNITED STATES BANKUPTCY JUDGE

I ASK FOR THIS:

/s/ *Jeremy S. Williams*

Jeremy S. Williams (DC 994825)

Peter J. Barrett

Adolyn C. Wyatt

KUTAK ROCK LLP

1021 East Cary Street, Suite 810

Richmond, Virginia  23219

Telephone: (804) 644-1700

Facsimile: (804) 783-6192

*Counsel for the Donald H. Patterson, III Revocable Trust*

4909-4673-2040.1