**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: | ) |
| | ) Case No. 24-00416-ELG |
| CRACKED EGGERY, INC. | ) Chapter 11, Subchapter V |
| Debtor and Debtor-In-Possession. | ) |

**DEBTOR'S OPPOSITION TO MOTION TO DISMISS CHAPTER 11 CASE**

Debtor, Cracked Eggery, Inc. (the "Debtor" or "Cracked Eggery"), by counsel, hereby submits this Opposition to the Donald H. Patterson, III Revocable Trust's ("Movant") Motion to Dismiss Chapter 11 Case (the "Opposition"), and respectfully states as follows:

**PRELIMINARY STATEMENT**

The Movant asserts a secured claim in this case which is at best, preferential, and at worst fraudulent, being based upon a UCC-1 filing recorded within a year of the filing of this case, and based upon a Security Agreement that was associated with a prior, cancelled Note. The Movant gives an elaborate exegesis of the operations of the stores, which are operated by non-debtor entities. . Notably, the Movant is not a creditor of those entities. The Debtor has explained its anticipated reorganization strategy both through counsel and in its meeting of creditors. The Movant has no interest is allowing the Subchapter V process to proceed, having not only filed this Motion, but also the Opposition to retention of counsel. There is no prejudice at all to allowing the Debtor to propose a plan that will be subject to the scrutiny of the Court. The only entity to benefit from a dismissal is the Movant, which seeks to preserve its questionable security

Kevin R. Feig (D.C. Bar 460479)
McNamee Hosea, P.A.
6404 Ivy Lane, Suite 820
Greenbelt, MD 20770
(301) 441-2420
kfeig@mhlawyers.com
*Proposed Counsel for Cracked Eggery, Inc.*

interest. Mr. Patterson was a Director of the Debtor until Spring of 2024, then stepping away from his responsibility to the Debtor in order to pursue his claims as a creditor.

### HISTORY OF THE DEBTOR

1. Cracked Eggery is a corporation organized under the laws of the District of Columbia and has been in operation since May of 2019.

2. Cracked Eggery was founded by Michael Tabb ("Mike"), Andrew Zarinsky ("AJ"), and George Brickelmair ("Ross" and collectively with Mike and AJ, the "Founders").

3. The Founders all serve on the Debtor's Board of Directors. Mr. Patterson served on the Debtor's Board of Directors until his resignation, on April 29, 2024. Mr. Patterson's Notice of Resignation from the Board of Directors is attached here to as Exhibit 1.

4. Prior to creating the concept of Cracked Eggery, the Founders gained extensive experience in restaurant operations at Georgetown Events, overseeing eleven restaurants that generated annual sales of $25-30 million.

5. After coming up with the concept, the Founders focused on getting Cracked Eggery off the ground. To accomplish this, they hosted weekend events, participated in farmers markets, and cultivated a modest but growing revenue stream as they searched for the right investor.

6. In January 2020, they launched a food truck entirely funded by their personal investments. The truck allowed the Founders to test and refine their menu and build a loyal customer base.[1]

7. Confident in their concept, the Founders decided it was time to move forward with brick-and-mortar locations.

---

[1] By the end of 2020, the food truck had generated over $300,000 in sales and laid the foundation for the brand's future success.

8. Just prior to the onset of the COVID-19 pandemic, in mid-2020, the Founders secured a lease for a location in Shaw ("Shaw" or "Cracked Store 1, LLC"), with another opportunity emerging in Cleveland Park ("Cleveland Park" or "Cracked Store 2, LLC"). The stock of Shaw and Cleveland Park (collectively herein referred to as the "Restaurants") are the principal assets of the Debtor.

9. Possessing limited financial resources, on or about June 21, 2021, to fund construction of the Restaurants, the Founders secured a $1 million loan (the "Original Note") for Cracked Eggery from the Donald H. Patterson, III Revocable Trust (the "Trust") and provided the Trust with a 30% equity interest in the Debtor. A Security Agreement in favor of the Trust was entered the same day but not recorded.[2]

10. Donald H. Patterson, III, the sole Trustee of the Trust ("Mr. Patterson") was expected to take an active operational role in the Debtor, which he declined to fulfill.

11. Despite Mr. Patterson's failure to fulfill his promises, the Founders continue their tireless work to build out the Restaurants and meet all obligations.

12. Cracked Eggery opened Cleveland Park in September 2021.

13. Shaw, which was also in development, faced delays and cost overruns due to changes in building codes instituted by the District of Columbia in the aftermath of the Covid pandemic.

14. Shaw finally opened in April 2022, but the delays, rising construction costs, and the Trust's refusal to invest additional capital put significant pressure on the Debtor's finances.

---

[2] The Original Note, and Security Agreement, were subsequently entirely cancelled and replaced with an unsecured Replacement Note. The Motion attaches a Security Agreement from the Original Note, that is conflates with the Replacement Note. The attached documents do not relate to each other.

15. On or about April 6, 2023, the Trust provided an additional cash infusion, which was consolidated with the 2021 loan balance, a new unsecured note was signed (the "Replacement Note"). The note provided the Trust with an additional 7.5% equity interest in the Debtor. The Replacement Note is attached hereto and incorporated herein as Exhibit 2.

16. The Replacement Note includes an integration clause which provides that the Replacement Note constitutes the entire contract between the Debtor and the Trust with respect to subject matter and supersedes all previous agreements and understandings, oral or written, with respect thereto. *See*, Replacement Note at ¶ 13.

17. No new security agreement was executed to accompany the Replacement Note, nor does the Replacement Note include any language suggesting that the Debtor or the Trust intended for it to be secured by any of the Debtor's assets.

18. Also, on or about April 6, 2023, the Trust executed a Cancellation of Promissory Note (the "Cancellation") of the Original Note. In the Cancellation, the Trust specifically acknowledges that it is the holder of an "unsecured Amended and Restated promissory Note," that the Original "Note has been superseded and replaced in its entirety with a single new unsecured promissory note made by [Debtor] dated April 6, 2023 and payable to the [Trust] in the total principal amount of $1,350,286.36," and the Trust further acknowledged that the Original Note has been "cancelled and terminated in its entirety." *See*, ¶¶ 1, 4 and 5 of the Cancellation of Promissory Note attached hereto as Exhibit 3.

19. On December 8, 2023, less than one year before the filing of the present case, and despite the complete cancellation of the Original Note and the execution of the unsecured Replacement Note, the Trust—while Mr. Patterson, the sole Trustee of the Trust, was also serving as a Director of the Debtor, thereby qualifying as an Insider under 11 U.S.C. § 101(31)(B)—filed,

4

or caused to be filed, a UCC Financing Statement with the DC Office of Tax and Revenue, Recorder of Deeds. The UCC Financing Statement is attached hereto and incorporated herein as Exhibit 4.

20. The filing of the UCC Financing Statement, which purports to create a lien in favor of the Patterson Trust; the legitimacy of that purported lien is disputed.

21. Prior to the initiation of this bankruptcy case, the Debtor was faced with the uncompromising demands of the Trust that Cracked Eggery pay all funds due to it, and turn over control of the entity.

## THE BANKRUPTCY CASE

22. The Debtor filed this Chapter 11 bankruptcy proceeding on December 5, 2024, in good faith, after it actively pursued alternative solutions that would be in Cracked Eggery's and creditors best interest. It will comply with all of the requirements of Subchapter V.

23. Since filing, the Debtor has complied with the requests of the Office of the United States Trustee including providing all requested documentation and attending the meeting of creditors that has been concluded after two hours of questioning.

24. Since filing, the Debtor has complied with all requests from the Office of the United States Trustee, including providing requested documentation and attending the meeting of creditors, which has been concluded after two hours of questioning

25. On December 19, 2024, just 14 days after the filing of this case, the filed a Motion to Dismiss Debtor's Chapter 11, Subchapter V Bankruptcy Case ("Motion to Dismiss"). Docket No. 18.

26. Responses to the Trust's Motion to Dismiss are due by January 9, 2024, approximately one month after the filing.

27. The Trust's Motion to Dismiss is replete with assertions and averments against the Debtor, all of which are related to alleged pre-petition conduct of Cracked Eggery, or the Founders. This flood of assertions and averments include statements that are irrelevant, speculative, materially false, misleading, and misrepresentation of facts. The Debtor will address the Trust's false assertions in this Opposition.

### **DEBTOR'S REFUTATION OF THE TRUST'S INACCURATE ALLEGATIONS**

28. The Trust's assertion that the Debtor's bankruptcy filing is a litigation tactic is completely baseless. The decision to explore bankruptcy restructuring was made in March 2024, well before any motion or threat of litigation from the Trust. In the months leading up to the Chapter 11 filing, Cracked Eggery thoroughly evaluated all options in the best interest of its long-term viability, the employees of the Restaurants, and its ongoing operational obligations. This filing applies only to the corporation, which holds the majority of the liabilities that are not current. The individual Restaurants remain current on their current financial obligations. The Debtor's bankruptcy filing is a strategic decision made to preserve the company's future, propose a chapter 11 plan to pay its creditors, and ensure continued business operations of the stores

29. The Trust claims that filing for bankruptcy at the Restaurant level would resolve the debt obligations more effectively. This is incorrect and misrepresents the situation at both the Restaurants and corporate levels. The Debtor, holds the majority of the debt which is not current and is the appropriate entity to file for bankruptcy. The Restaurants have continued to operate efficiently, paying down debts, paying payroll and all other monthly financial obligations as the come due. The Restaurants are on the path to generate sufficient income to provide upstream payments to the Debtor. Further, a disagreement about bankruptcy strategy for non-debtor

6

entities is not a basis for dismissal. The assertions never consider issues of expense, the problems of operating restaurants in Chapter 11, banking issues that arise and the like.

30. The Debtor categorically denies the claims set forth in Paragraph 4 of the Motion to Dismiss, which states as a fact that the bankruptcy filing was a result of mismanagement, personal gain by the Founders, or deliberate attempts to avoid potential financing. The Trust's allegations are misleading, factually incorrect, and fail to recognize the true circumstances surrounding the financial struggles.

31. Contrary to the Trust's assertion, the Founders have consistently prioritized the Restaurants and the Debtor's long-term viability over personal gain. The Debtor's assets were utilized to maintain and fulfill obligations, not redirected to "the pockets of management." The Founders who lack any independent wealth, have worked diligently, often sacrificing their own modest $5,000 monthly salaries to ensure the survival of the Debtor and the Restaurants. Claims of personal gain are baseless and ignore the considerable sacrifices made by the Founders to ensure the continued operation of the business.

32. The Trust asserts that funds provided by the Trust were "grossly mismanaged" by the Debtor. This claim is unsubstantiated. The Debtor provided comprehensive documentation to the Trust showing that all financial decisions, including the handling of funds and loan obligations, were made transparently and with the full involvement of the Trust. The Trust was continuously kept abreast of the financial condition of Cracked Eggery and the Restaurants. As an example, the $30,000 total payment was known to the Movant at the time of the loan.

33. The Trust's allegation that the Debtor and the Founders declined to obtain potential financing in favor of protecting management's equity interests is likewise inaccurate. In truth, the Founders took all reasonable steps to secure financing, including engaging with Mr.

7

Patterson's own financial advisor, submitting necessary documents and full disclosure. Despite the Movant's own advisor's recommendations to either invest additional capital or secure a loan. The Trust declined this advice, even going so far as to refuse to submit Mr. Patterson's personal financial documents to Eagle Bank for the Debtor to obtain a commercial loan after the Founders had already provided their information . Ultimately, Mr. Patterson's failure to provide financial documents, assured Eagle Bank's denial of the Debtor's loan application. Eagle Bank confirmed to the Founders that it had not received any documents from Mr. Patterson at the time the decision to deny the loan was made. Mr. Patterson subsequently informed the Founders that the bank had declined the loan and that he was unwilling to sign on a loan with them.

34. The Trust's characterization of the events surrounding the construction delays at the Shaw location and the handling of the loan payments is knowingly inaccurate. When the Shaw construction encountered delays, the Founders proactively engaged with Mr. Patterson to discuss potential remedies, including the possibility of delaying loan payments or investing more capital to ensure the company's cash flow during construction. The Trust rejected these proposals, leaving the Debtor with the difficult decision of whether to default on the lease or secure a loan from another source. The Trust's refusal to cooperate or provide the necessary support left the Debtor with no choice but to proceed with securing additional financing, which was ultimately necessary to keep the businesses afloat during a critical period.

35. Debtor disputes the Trust's version of events related to the decision-making process surrounding the acquisition of the Toast Capital Loan.

36. In October 2021, when the Debtor faced its first construction delay at the Shaw location, the Founders proactively engaged with Mr. Patterson to discuss ways to address the company's financial challenges. Specifically, the Founders sought to delay the Trust's loan

8

payments and/or invest additional capital, along with interest, to help the business retain sufficient cash flow, to complete the construction, and open the Shaw location. Despite these efforts to work collaboratively, the Trust refused to cooperate and declined to provide the necessary support, which left the Founders with no viable alternative but to secure external financing. During this period, the Founders were forced to make significant sacrifices, including forgoing their guaranteed payments, in order to preserve the Restaurants.

37. The Trust's assertions regarding the tax situation, the failure to pay Sales and Use Taxes was an issue that continued to plague the business and claims that the Trust was not kept abreast of the situation are factually inaccurate. Mr. Patterson was a member of the Board of Directors at that time.

38. The Trust was fully aware that taxes were not paid in full, and this knowledge was consistently communicated. At this time, the stores are current on their payment plan with the District of Columbia. Contrary to the Trust's claims, the Trust was informed on multiple occasions about the status of unpaid meals taxes including, but not necessarily limited to:

a. A December 30, 2021 conference call took place between the Trust, the Founders, and the accountant.

b. A December 8, 2022 call between the Trust, the Founders, and the accounting team, addressing not only unpaid meals taxes but also existing loans and potential funding solutions.

c. A December 8, 2022 text between, Mr. Patterson and one of the Founders where Mr. Patterson inquired about the "meals tax," indicating that he was aware of the tax issue.

    d. On April 17, 2022 the Trust received a comprehensive financial breakdown, which clearly identified the unpaid meals taxes as part of the company's cash flow.

    e. The Trust received regular financial reports, including monthly bank statements, profit and loss statements, and updates on cash flow, all of which consistently highlighted the unpaid meals taxes.

    f. Additionally, the Trust had real-time access to the business's bank accounts, credit card statements, sales reporting, and labor reports, which included information on the taxes owed.

39. It is important to note that a significant portion of the meals tax obligation has been satisfied through third-party sales platforms for delivery and online ordering. This resulted in a remaining balance of sales incurred through in-store transactions, which accounts for the unpaid balance. Therefore, the assertion that the taxes were entirely unpaid is misleading, as a substantial portion of the tax liability was addressed through external platforms.

40. The Trust asserts that its Note is properly secured. This is not accurate and is now the subject of Adversary Proceeding 25-10001 filed in this case.

## **DISMISSAL IS NOT JUSTIFIED UNDER 11 U.S.C. § 1112**

41. The Trust asserts that dismissal pursuant to 11 U.S.C. § 1112(b) is appropriate.

42. The Bankruptcy Code provides for conversion or dismissal of a chapter 11 case for cause:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause…

11 U.S.C. § 1112(b)(1).

43. A list of items that constitute cause is provided at 11 U.S.C. § 1112(b)(4) and includes the following:

> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
> (B) gross mismanagement of the estate;
> (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;
> (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;
> (E) failure to comply with an order of the court;
> (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;
> (G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;
> (H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);
> (I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;
> (J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;
> (K) failure to pay any fees or charges required under chapter 123 of title 28;
> (L) revocation of an order of confirmation under section 1144;
> (M) inability to effectuate substantial consummation of a confirmed plan;
> (N) material default by the debtor with respect to a confirmed plan;
> (O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and
> (P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

11 U.S.C. § 1112(b)(4).

44. Every item included in 11 U.S.C. § 1112(b)(4) recitals of cause relates to post-petition actions (or inactions) of a debtor.

45. As the Trust cannot point to a single, specific post-petition action taken by the Debtor that would constitute cause, it relies entirely on self-serving, false assertions related to alleged pre-petition activities of the Debtor and/or speculative post-petition activity of the Debtor like, "[t]he Debtor is potentially violating section 11 U.S.C. § 1112(b)(d) [sic] through the unauthorized use of cash collateral." *See,* the Motion to Dismiss at ¶ 48.

46. In its Motion to Dismiss, the Trust cites pre-petition gross mismanagement of the Debtor as grounds for dismissal in several paragraphs. The Debtor categorically denies any allegations of gross mismanagement. However, assuming, arguendo, that there was pre-petition gross mismanagement, it is important to note that gross mismanagement pertains solely to post-petition conduct and does not constitute grounds for dismissal under 11 U.S.C. § 1112. See *In re M.A.R. Designs & Construction, Inc.*, 653 B.R. 843, 857 (Bankr. S.D. Tex. 2023).

47. Contrary to the assertions in the Trust's Motion to Dismiss, the Restaurants are meeting all their monthly financial obligations and generating sufficient positive income to pass funds upstream to the Debtor and support a Chapter 11 plan of reorganizationand the Movant is fully aware of why those streams of income are likely to increase.

48. A motion filed under 1112 invokes a two-step analysis, first to determine whether "cause" exists either to dismiss or to convert the Chapter 11 proceeding to a Chapter 7 proceeding, and second to determine which option is in "the best interest of creditors and the estate." *See Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 242 (4th Cir. 1994) (citing *In re Mechanical Maintenance, Inc.,* 128 B.R. 382, 386 (E.D.Pa.1991)).

49. The "cause" requirement of § 1112(b) may be satisfied by showing a subjective bad faith on the part of the debtor, in that the motive for filing the Chapter 11 petition was to

abuse the reorganization process, coupled with an objective element that reorganization is in fact unrealistic. *See Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 242 (4th Cir. 1994), citing *Carolin Corp. v. Miller,* 886 F.2d 693, 700–02 (4th Cir.1989). Neither of those preconditions exists in this case.

50. The Trust, as the moving party bears the burden of proving cause, by a preponderance of the evidence. *Id.* at 855. This is a burden that the Trust has not and cannot satisfy.

51. The Debtor filed this case in good faith, it can and will propose a confirmable plan of reorganization, and the Trust cannot establish otherwise.

52. As the Trust cannot establish cause for the dismissal or conversion of the case, its Motion to Dismiss pursuant to 11 U.S.C. § 1112 must be denied.

## **DISMISSAL IS NOT JUSTIFIED UNDER 11 U.S.C. § 305**

53. The Trust asserts that dismissal pursuant to 11 U.S.C. § 305 is appropriate; 11 U.S.C. § 305(a)(1) permits dismissal if the interests of creditors and the debtor would be better served by such dismissal or suspension.

54. The Trust, in its Motion to Dismiss attempts to paint this case as only a dispute over the rights of two competing shareholders, concluding that it would be better to resolve such issues in the courts of the District of Columbia .

55. There has only been limited litigation between the Debtor and the Trust. The Debtor brought an action in the Superior Court of the District of Columbia to enforce the Shareholders' Agreement and require Specific Performance from the Trust (Superior Court Civil Action Case Number 2024-CAB-004314).

56. In substance, the complaint sought to require the Trust to participate in a binding mediation process as set out in the Shareholders' Agreement.

57. The Trust, not wishing to abide by the terms of the Shareholders' Agreement, filed a motion to dismiss the complaint.

58. On October 8, 2024, the DC Superior Court issued an Order granting Defendant's Motion to Dismiss. In the order, the Court stated that as a result of defects in the Shareholders' Agreement, "neither party to the Complaint is a shareholder" under the aforementioned Shareholders Agreement.

59. Aside from the pending Adversary Proceeding filed by the Debtor in this case, there is currently no pending litigation between the Trust and the Debtor.

60. Chapter 11 is the appropriate venue to resolve the debt issues of the Debtor, the Trust and the other creditors.

61. The Debtor and the creditors, as a whole, are better served by allowing this chapter 11 case to proceed and this proceeding is the most efficient venue to allow for resolution.

62. As the Trust cannot establish that the interests of the creditors and the debtor would be better served by dismissal of this case, the Motion to Dismiss pursuant to 11 U.S.C. § 305 must be denied.

## **CONCLUSION**

63. The Trust's Motion to Dismiss is based on a series of false and misleading factual allegations that do not provide a valid legal basis for dismissal. Given it is was filed days after the Petition Date, and can assert not ongoing loss, the only conclusion is that it was filed to try to preserve the Movant's questionable security interest. As demonstrated above, the Debtor has acted transparently, in good faith, and in accordance with all legal and contractual obligations

throughout its restructuring process. The Debtor respectfully requests that this Court deny the Trust's Motion to Dismiss, as there is no factual and legal basis for dismissal.

Dated: January 9, 2025                                Respectfully submitted

/s/ Kevin R. Feig
Kevin R. Feig (Bar No. 460479)
Janet M. Nesse (Bar No. 358514)
McNamee Hosea. P.A.
6404 Ivy Lane, Suite
820 Greenbelt, MD 20770
(301) 441-2420
jnesse@mhlawyers.com
kfeig@mhlawyers.com
*Proposed Counsel for Cracked Eggery, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this January 9, 2025, I caused a copy of the forgoing to be served by CM/ECF to all parties receiving notice thereby, and via first-class mail, postage prepaid to the parties on the attached mailing matrix.

/s/ Kevin R. Feig
Kevin R. Feig